**Daniel FREEMAN, Plaintiff,**

v.

**COMPLEX COMPUTING COMPANY, INC., et al., Defendants.**

**No. 95 Civ. 3811 (LAK).**

United States District Court,
S.D. New York.

June 28, 1996.

Barbara E. Olk, Ted Trief, Trief & Olk, New York City, for Plaintiff.

Richard B. Cohen, Akabas & Cohen, New York City, for Defendants Complex Computing Co., Inc. and Jason Glazier.

James F. Rittinger, Satterlee Stephens Burke & Burke LLP, New York City, for Defendant Thomson Trading Services, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Daniel Freeman claims that defendant Complex Computing Company ("C3") breached the contract between them and that C3 was tortiously induced to do so by defendants Jason Glazier and Thomson Trading Services, Inc. ("Thomson"). Now before the Court are defendants' motion to stay this action pending arbitration and plaintiff's cross-motion to compel all defendants to arbitrate and to disqualify defendants' counsel on the basis of the witness-advocate rule.

### Facts

In September 1993, plaintiff and C3 entered into an agreement pursuant to which Freeman agreed to sell C3's computer software in exchange for commissions based on sales or licenses made to customers, as well as on revenues received from those customers, over a ten year period. The agreement contained a broad arbitration clause[1] and was terminable by C3 on sixty days notice. The agreement provided also that it was to bind the heirs, legal representatives, successors and assigns of the parties.

On or about August 22, 1994, C3 and Thomson allegedly entered into an agreement pursuant to which Thomson would act as a redistributor of C3's product, and C3 granted it exclusive worldwide sales and marketing rights. By letter dated October 14, 1994, received by plaintiff on October 17, 1994, C3 terminated its agreement with plaintiff, effective sixty days thereafter.

---

1. Section 13 provided: "Any controversy or claim arising out of or related to this Agreement or any breach hereof [with an exception not here relevant] shall be settled by arbitration in accordance with the rules of the American Arbitration Association in New York, NY, and judgment upon such award rendered by the Arbitrator may be entered in any court having jurisdiction thereof."

Plaintiff brought this action against C3, Glazier and Thomson on May 25, 1995. The complaint asserts claims against C3 and, on successor liability theories, Thomson for breach of contract. It seeks relief from Glazier and Thomson for inducement of C3's alleged breach of contract and on a fraudulent conveyance theory.

Defendants responded by seeking a stay of the action pending arbitration. C3 contends that plaintiff is obliged to arbitrate his claims against C3 and argues that the claims against the other defendants should not proceed until the arbitration is concluded. Plaintiff counters by seeking to compel *all* of the defendants to arbitrate, asserting that Glazier and Thomson are obliged to arbitrate on the theory that they are *alter egos* of or successors in interest to C3. Defendants rejoin that plaintiff, in consequence of his commencement of this action, may not compel arbitration and, in any case, that there is no basis for holding that the arbitration clause binds Glazier and Thomson.

## *Discussion*

### *Arbitrability of the Claim Against C3*

Plaintiff's claim falls within the broad language of the arbitration clause; indeed, no one suggests otherwise. While plaintiff ignored the arbitration clause in commencing this action, C3's immediate response was to seek enforcement of the arbitration clause by moving for a stay of this action pending arbitration. Were that the concluding chapter of the story, the result would be obvious. C3's papers in opposition to plaintiff's cross-motion to compel arbitration, however, argue that plaintiff may not *compel* arbitration in view of its having resorted to the Court in the first instance. Thus, C3's position is that the litigation against it should be stayed pending arbitration, but that plaintiff is not entitled to an order compelling C3 to proceed with the arbitration. This position is without merit.

■ C3's first argument rests on Section 3 of the Federal Arbitration Act (the "Act"), 9 U.S.C. § 3, which provides:

> "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, *providing the applicant for the stay is not in default in proceeding with such arbitration.*" (Emphasis added)

C3 contends that the italicized language precludes plaintiff from compelling arbitration because its commencement of this action constituted a default in proceeding with the arbitration. The argument, however, takes the language out of the broader context of Section 3.

Section 3 requires the Court to compel arbitration "on application of one of the parties," not on application of one of the defendants. The statute thus contemplates the issuance of an order compelling arbitration upon application of a plaintiff, which would be inconsistent with defendants' proposed construction of the final clause of the section. The final clause readily may be read more narrowly as precluding compulsion only at the instance of a plaintiff who had obstructed or otherwise interfered with the progress of a pending arbitration. As the statute must be construed in a manner that would give meaning to each of its parts, defendants' contention must be rejected.[2]

■ C3 argues also that plaintiff's commencement of this action waived his right to arbitrate. Waiver, however, is not to be inferred lightly. There must be some prejudice to the party asserting the waiver. *Leadertex, Inc. v. Morganton Dyeing & Fin-*

---

**2.** C3 relies on *C. Itoh & Co. v. Jordan Int'l Co.,* 552 F.2d 1228 (7th Cir.1977), and *Miller v. Aaacon Auto Transp., Inc.,* 545 F.2d 1019 (5th Cir. 1977). Both hold only that a party responsible for delays in an arbitration is not entitled to the issuance or continuation of a stay of litigation pending arbitration. In other words, a party cannot deprive its adversary of the right to have a matter adjudicated in one forum or another. Plaintiff in this case is prepared to proceed to arbitration and has done nothing to prevent his dispute with C3 from being arbitrated.

*ishing Corp.*, 67 F.3d 20, 25 (2d Cir.1995); *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 889 (2d Cir.1985). While plaintiff's commencement of this action gives pause, the explanation is reasonably plain. Absent an express agreement to arbitrate with Glazier and Thomson, plaintiff sought a single forum in which he could be sure of the right to proceed against all parties. He then sought an order compelling all three defendants to arbitrate. The explanation is not unreasonable in the circumstances. *See Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir.1991) (there is no 'bright line' test for prejudice sufficient to waive right to compel arbitration; prejudice must be assessed on facts and circumstances of each case). There is no prejudice to the defendants. In consequence, the Court holds that plaintiff did not waive his right to arbitrate by commencing this action. In any case, C3 cannot be heard to assert the waiver argument in view of its own motion to stay this action pending arbitration, which of course post-dated the filing of the action and manifested C3's insistence on arbitration despite any waiver by plaintiff.

*The Arbitrability of the Claim Against Glazier*

■ Glazier resists plaintiff's motion to compel him to arbitrate on the ground that he is not party to any arbitration clause. Plaintiff rejoins that the relationship between C3 and Glazier is so intimate that Glazier is bound by the arbitration clause in the Freeman–C3 contract. This presents an interesting issue on very unusual facts.

■ Arbitration is a matter of private contract. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Nevertheless, a non-signatory may be bound to arbitrate in a number of circumstances, most notably for purposes of this case where the relationship between a corporate party to an arbitration agreement and its parent entity "is sufficiently close as to justify piercing the corporate veil and holding [the shareholder]

legally accountable for the actions" of the corporate signatory. *Thomson–CSF, S.A. v. American Arbitration Association*, 64 F.3d 773, 777 (2d Cir.1995). Plaintiff here argues that the relationship between Glazier and C3 warrants the conclusion that Glazier is bound by C3's arbitration clause—notwithstanding the fact that Glazier was not an officer, director, employee or stockholder of C3. On the highly unusual facts of this case, the Court agrees.

Glazier is a recent doctoral graduate of Columbia University in computer science. In the early 1990s, while a Columbia student, he developed computer software, which he believed could be licensed profitably.[3] (Akabas Aff. ¶ 2) Columbia, however, prohibited students receiving fellowship monies from serving as an officer, director or shareholder of an entity licensing such software for profit. (*Id.* ¶ 3) For reasons that are far from clear, it nevertheless permitted such students to establish corporations which would license the software from Columbia and sublicense it to others for profit and to serve as independent contractors to such corporations. This permitted the students to earn money from the software licensing activity, while Columbia derived royalty income. (*Id.*) Such an arrangement was the genesis of C3.

C3 was organized on September 16, 1992 by Elizabeth Slater as sole incorporator. One Jonathan Hochman initially was the sole director and shareholder. Hochman thereupon elected Seth Akabas, Glazier's lawyer, and one Naim J. Peress as C3's officers. (*Id.* ¶ 4) Two months later, the board was expanded to two, Gary Feldman was designated to fill the vacancy thus created, Hochman resigned from the board, and Feldman subscribed to 199 C3 shares at a price of $0.01 per share. At the same time, the board designated Glazier as the sole signatory to C3's bank account, and C3 entered into a consulting agreement with Glazier, Inc., a corporation wholly owned by Glazier. (*Id.* ¶ 5 & Exs. E, F, G) Moreover, Glazier entered into an option agreement with Feldman. (Olk Aff. Ex. 7) The terms of the

---

**3.** He was also an expert computer consultant to Citibank, earning in excess of $1,000 per day.

consulting and option agreements are critical in assessing plaintiff's position here.

The consulting agreement obligated Glazier, Inc. to serve C3 and vested in it the responsibility "for marketing [C3's] software products, developing new software products, enhancing [C3's] existing software products, and providing support services to [C3's] clients." (Akabas Aff. Ex. F § 3) It was terminable if Glazier himself was unable to perform or supervise the performance of Glazier, Inc.'s obligations. (Id. § 5) C3 was obligated to pay Glazier, Inc. annual compensation of $150,000, subject to adjustment for changes in the consumer price index. In addition, Glazier, Inc. was entitled to a "bonus" for each calendar year equal to 60% of the first $200,000, 70% of the next $200,000, 80% of the third $200,000, and 85% of all royalties received by C3 in excess of $600,-000. (Id. § 4) Indeed, C3 covenanted that it would not pay any compensation whatsoever to anyone unless Glazier, Inc. had received every nickel to which it was entitled under the agreement. (Id. § 4(f)) Since the clause determined Glazier, Inc.'s bonus on the basis of royalties—that is to say, gross revenues as opposed to net profits—the effect of the clause was to funnel the lion's share of C3's revenues to Glazier, Inc. and presumably to Glazier.[4]

The option agreement that Glazier entered into with Feldman also is quite significant. Feldman, by then the sole stockholder of C3, granted Glazier the option to purchase all of his shares at any time during the five year term of the agreement for $2,000. (Olk Aff. Ex. F) Thus, the option agreement gave Glazier the entire benefit of any appreciation in the value of the stock, and thus of C3. Moreover, by giving him the right to acquire all of the outstanding equity at any time for nominal consideration, it gave him the ability to oust Feldman as a director and, either directly or indirectly, to control the identities of the officers and directors.

Considerably more could be said. Glazier, for example, held himself out as technical

director of C3. But there is no need. Glazier had total control over the operation of C3. He had the sole economic interest of any significance. To regard him as anything but the sole stockholder and controlling person of C3 would be to exalt form over substance.

■ As the Circuit recently reiterated, "the courts will pierce the corporate veil 'in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary.'" Thomson–CSF, S.A., 64 F.3d at 777 (quoting Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 26 (2d Cir.1993)); see also Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 138 (2d Cir.1991). Here, C3 was formed by Glazier as a vehicle to comply in form with Columbia University's policy on the exploitation of software developed by its graduate students. It was Glazier's intellectual product and powers that C3 had to sell. Glazier was to receive the overwhelming bulk of its gross revenues. He had the sole power of signature over its bank accounts. The option gave him complete control over Feldman's actions as C3's sole stockholder and thus the power to control the selection and continuation in office of its directors and officers, as well as the sole interest in the economic achievement of the corporation. Hence, Glazier did not merely dominate and control C3—to all intents and purposes, he was C3. Glazier therefore is bound by the arbitration clause in the C3–Freeman contract.

### Arbitrability of the Claims Against Thomson

Freeman contends that Thomson too is bound by his arbitration agreement with C3, as C3's successor. This theory, however, is unavailing.

■ Freeman and Thomson agree that a corporation that purchases the assets of another entity normally is liable under New York law for the debts and liabilities of the seller only in certain exceptional circum-

---

4. C3's 1994 federal income tax return shows gross revenues of $563,257. Of this total, $397,-900 was paid for consulting, $66,541 for development, and virtually the entire balance for sales commissions, legal and accounting services, and as royalties (presumably to Columbia). (Olk Aff. Ex. I)

stances. The exceptions that both sides recognize are stated in *Schumacher v. Richards Shear Co., Inc.,* 59 N.Y.2d 239, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983):

> "A corporation may be held liable for the torts of its predecessor if (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuance of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Id.* 59 N.Y.2d at 245, 464 N.Y.S.2d at 440, 451 N.E.2d at 198.

It is in the application of this standard, however, that the parties part ways.

Plaintiff asserts that Thomson should be held to be C3's successor under each of these four exceptions. The Court addresses each.

### 1. Express or Implied Assumption

The Assets Purchase Agreement between C3 and Thomson precludes any holding that Thomson expressly or impliedly assumed any obligation under C3's contract with plaintiff. Section 2.2 of the Agreement states:

> "2.2 *Liabilities not Assumed by [Thomson].* Anything in this Agreement to the contrary notwithstanding, [C3] shall be responsible for all of its liabilities and obligations not expressly assumed by [Thomson] and [Thomson] shall not assume, or in any way be liable or responsible for, any liabilities or obligations of [C3] except as specifically provided [in Schedule 1.1(v) to the Agreement]. Without limiting the generality of the foregoing, [Thomson] shall not assume, and [C3] expressly retains liability for, the following:
>
>> "(i) any liability or obligation under contracts and other agreements to which C3 is a party or by or to which it or its assets, properties or rights are bound or subject other than [those provided for in Schedule 1.1(v) of the Agreement];
>>
>> "(ii) any liability or obligation of C3 arising out of (a) the conduct of the Business prior to the Closing Date ..., or (b) a

breach or default by C3 prior to the Closing Date under any contract or other agreement, or (c) any tortious conduct by C3 prior to the Closing Date;

>> "(iii) any liability or obligation of C3 to any of its employees, agents, or contractors,...." (Slafsky Aff. Ex. H at 5–6)

Schedule 1.1(v) to the Agreement lists the obligations assumed by Thomson; the list does not include plaintiff's contract. (*Id.* at Sched. 1.1(v)) Moreover, Section 5.4 of the Agreement provides:

> "5.4 *Agreements. Schedule 1.1(v)* sets forth all material contracts and other agreements (whether written or oral) to which C3 is a party, or by or to which C3 or its assets or properties are bound or subject, which relate to or which do or might affect the Purchased Assets of the Business, *other than those agreements specifically relating to Dan Freeman.*" (*Id.* at 11, emphasis added)

Thus, the Agreement expressly provided that Thomson did not assume C3's obligations under its contract with Freeman. *See Ricciardello v. J.W. Gant & Co.,* 717 F.Supp. 56, 58 (D.Conn.1989). This express provision, moreover, precludes the possibility that a contradictory obligation might be implied. *See Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 309, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 90–91 (1983) (contract will not be interpreted to imply terms contrary to its express provisions).

### 2. "Mere Continuance"

Any contention that Thomson is a "mere continuance" of C3 would be meritless. While *Schumacher* guides courts in looking beyond corporate formalities, it does not instruct that such formalities are to be ignored altogether. *Schumacher* expressly held that successor liability attaches to a corporation as a "mere continuance" only when "one corporation survives the transaction; the predecessor corporation must be extinguished." 59 N.Y.2d at 245, 464 N.Y.S.2d at 440, 451 N.E.2d at 198. Plaintiff acknowledges that C3 continues to exist, if only as a virtually empty shell. Thus, "[s]ince [C3] survived the instant purchase agreement as a

distinct, albeit meager, entity, ... [Thomson] cannot be considered a mere continuation of [C3]." *See id. Accord, e.g., Ladjevardian v. Laidlaw–Coggeshall, Inc.,* 431 F.Supp. 834, 839 (S.D.N.Y.1977); *Mitchell v. Suburban Propane Gas Corp.,* 182 A.D.2d 934, 935, 581 N.Y.S.2d 927, 929 (3d Dept.1992).

### 3. Merger

 Conceivably, Thomson could be bound by C3's contract with plaintiff had there been a consolidation or merger of C3 with Thomson. Formally, of course, there was not, as Thomson merely purchased assets from C3. The Court must consider, however, whether there was a *de facto* merger. *See Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.,* 775 F.2d 38, 42 (2d Cir.1985) (holding that a corporation surviving a *de facto* merger is liable for claims against the predecessor corporation).

A *de facto* merger can be shown by some combination of the following factors:

"(1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) a continuity of management, personnel, physical location, assets, and general business operation." *Lumbard v. Maglia, Inc.,* 621 F.Supp. 1529, 1535 (S.D.N.Y. 1985).

Each of these factors is relevant, but the presence or absence of any single factor is not determinative. *Arnold Graphics,* 775 F.2d at 42.

In this case, the *de facto* merger factors cut both ways. There is no continuity of ownership. Thomson paid cash to C3 for its assets; C3's owner or owners received no ownership interest in Thomson. (*See* Slafsky Aff. Ex. H. Sched. 3.3) Nor has there been any formal dissolution of C3. (*Id.* Ex. D at 30–34, Exs. J–K) On the other hand, C3 had made no sales from the time of the execution of the Assets Purchase Agreement to the time that the motions in this case were filed, a period of eleven months. (Olk Aff. Ex. D. at 97; Thomson Mem. at 9–10) Moreover, on the date that the Assets Purchase Agreement was signed, Thomson and C3 signed also another agreement terminating a license agreement between the two of them "on the basis that [C3] will cease to do business as of the date hereof." (Olk Aff. Ex. EE) Thus, it would not be unreasonable to conclude that C3 has ceased ordinary business.

As discussed above, under the Assets Purchase Agreement Thomson expressly assumed many of C3's obligations and liabilities. (*See* Slafsky Aff. Ex. H at 11 & Sched. 1.1(v)) That these obligations were those necessary for the uninterrupted continuation of C3's business seems established by the fact that, subsequent to the purchase, Thomson has (i) provided all support services required by customers who had purchased C3's software[5] and (ii) assumed the contracts of C3's independent contractors, other than plaintiff.[6] (Olk Aff. Ex. D at 108)

Finally, there is the matter of continuity of business operations. Here, the balance tips against plaintiff. Clearly there has been a change in management; however important his new position, Glazier now works for Thomson. There has been a change also in the physical location of the business. Where once Glazier carried on C3's business in New York, he now works at Thomson's offices in Massachusetts. (Pl. Mem. at 3–4) While it appears that three of C3's four contractors now are employed by Thomson, it is not clear whether they have been joined by Thomson's personnel in performing, and expanding the scope of, the work that formerly had been done by C3. While Thomson purchased most of C3's assets, C3 has retained ownership of cash and a "technical analysis software package" that, as of the time that motions were filed in this case, was in development but had not yet been marketed. (Slafsky Aff. Ex. D at 8, 98) It stretches credulity to characterize the assets and per-

---

**5.** Olk Aff. Ex. D at 98.

**6.** C3 never had employees. (Olk Aff. Ex. C at 33 & 35) It performed all of its work through its independent contractors: Glazier, Freeman, David Ohsie, and Steven Ohsie. (Olk Aff. ¶ 23)

sonnel of Thomson, a multi-billion dollar corporation, as "continuous" with those of C3, which Thomson purchased for $300,000.

In these circumstances, given that there is no continuity of ownership, physical location, management, assets, or personnel, nor a dissolution of C3, there has not been a *de facto* merger. *See Ladjevardian v. Laidlaw–Coggeshall, Inc.,* 431 F.Supp. 834, 838–39 (S.D.N.Y.1977) (holding that identity of certain employees and one officer between purchaser and seller did not make asset sale a *de facto* merger where seller continued to exist).

### 4. Fraudulent Transfer

 The last of the four exceptions to the general rule against successor liability provides that the purchaser of a corporation's assets may be liable for claims against the seller when "the transaction was entered into fraudulently to escape such obligations." *Schumacher,* 59 N.Y.2d at 245, 464 N.Y.S.2d at 440, 451 N.E.2d at 198. Plaintiff claims that Thomson, C3, and Glazier entered into this transaction with the intent of avoiding C3's obligations to him. The fact that Thomson explicitly declined to assume C3's contract with plaintiff makes it clear that Thomson was aware of the liability. Plaintiff claims also that Thomson knew that Glazier would remove the proceeds of the asset sale from C3, thereby rendering C3 insolvent.

 Under New York law governing fraudulent conveyances, a transaction is not fraudulent if it is both an exchange for equivalent value and made in good faith. *Computerland Corp. v. Batac, Inc.,* 750 F.Supp. 97, 98 (S.D.N.Y.1990).

"[A] transaction is void for lack of good faith when 'one or more of the following factors is lacking (1) an honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others.

7. Plaintiff offers two additional theories in support of his claim that Thomson is obliged to arbitrate as C3's successor. Neither has merit.

First, he contends that New York recognizes what he calls a "continuity of enterprise" theory

The term "good faith" does not merely mean the opposite of the phrase 'actual intent to defraud.' '" *Id., quoting Southern Industries, Inc. v. Jeremias,* 66 A.D.2d 178, 182, 411 N.Y.S.2d 945, 949 (2d Dept. 1978).

In this case, plaintiff makes no allegation that Thomson purchased C3's assets for inadequate consideration. Thus, his claim that the transaction was fraudulent depends upon his contention that Thomson bought C3's assets, knowing that Glazier would remove the proceeds of the sale from the company in order to obstruct any claim that plaintiff might assert against C3 for breach of contract. Plaintiff makes this allegation on information and belief, however, and offers virtually no evidentiary support for it. *Cf. Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). He suggests only that a lack of good faith may be inferred from the existence in the Assets Purchase Agreement of indemnity and escrow provisions, which explicitly stated that the escrow fund would be used in part to protect Thomson from any claim that plaintiff might assert. (*See* Slafsky Aff. Ex. H § 11.4)

The mere fact that Thomson anticipated that plaintiff might sue it as a result of the asset purchase does not suggest that Thomson entered into the transaction with a lack of good faith. Lawsuits are a foreseeable consequence of many transactions, and measures taken to protect against them often cannot be presumed to be confessions that the transactions are entered into with evil intent. Thus, plaintiff has offered no evidence from which it could be found that the Assets Purchase Agreement was fraudulent.

As Thomson is not a mere continuance of C3 and because there has been no fraud, *de facto* merger, nor assumption of liability, plaintiff's claim that Thomson is obliged to arbitrate as successor to C3 must fail.[7]

of successor liability first articulated in *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976). It is far from clear, however, that New York recognizes this theory. *See Howard v. Clifton Hydraulic Press Co.,* 830

### Thomson's Motion for a Stay

■ Although Thomson is not obliged to arbitrate plaintiff's claims against it, that is not to say that plaintiff should now be permitted to litigate those claims. Plaintiff's claims against Thomson all are derivative of its claims against Glazier and C3. Absent a recovery by plaintiff on those claims, there is no case against Thomson. Accordingly, it would make little sense to permit the case against Thomson to proceed before the arbitration among plaintiff, C3 and Glazier is concluded.

■ District courts have inherent control over their dockets. *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 165–66, 81 L.Ed. 153 (1936); *Citrus Marketing Bd. of Israel v. J. Lauritzen A/S*, 943 F.2d 220, 225 (2d Cir.1991). They may stay proceedings where the interests of justice or judicial economy thus would be served. The Court therefore will stay this action insofar as it is brought against Thomson.

### The Disqualification Motion

Plaintiff seeks also to disqualify the firm of Akabas & Cohen, counsel to C3 and Glazier, under DR 5–102 on the ground that Mr. Akabas negotiated the C3–Thomson contract and therefore is a likely witness in this case. It is unnecessary, however, to rule on the point given the fact that the matter is being sent to arbitration. Should plaintiff wish to raise the point in that forum, the arbitrator(s) no doubt will deal with it in due course.

### Conclusion

The pending motions are disposed of as follows:

1. Judgment shall be entered compelling plaintiff, C3 and Glazier to arbitrate their disputes in accordance with the contract between plaintiff and C3. This judgment disposes of all claims asserted herein between and among these three parties.

2. Plaintiff's motion to compel arbitration of his claims against Thomson is denied. Plaintiff's claims against Thomson, however, are stayed pending the final determination of the arbitration among plaintiff, C3 and Glazier.

3. Plaintiff's application to disqualify the firm of Akabas & Cohen is denied without prejudice to renewal before the arbitrator(s).

4. So much of this proceeding as is not otherwise disposed of by this order is placed on the suspense docket.

SO ORDERED.

---

F.Supp. 708, 711 (E.D.N.Y.1993); *Diaz v. South Bend Lathe Inc.*, 707 F.Supp. 97, 102 n. 1 (E.D.N.Y.1989). More importantly, the test articulated in *Turner* is redundant with the test for a *de facto* merger under New York law, which the Court has held that is not satisfied.

Next, plaintiff contends that Thomson may be obliged to arbitrate as C3's successor under a "product line" theory. This theory, to the extent recognized in New York law, applies where it would be fair to require a successor "to assume a responsibility for *defective products* that was a burden necessarily attached to the original manufacturer's good will ... enjoyed by the successor in the continued operation of the business." *Salvati v. Blaw–Knox Food and Chemical Equipment, Inc.*, 130 Misc.2d 626, 629–30, 497 N.Y.S.2d 242, at 244–45 (Sup.Ct. Queens Co. 1985) (emphasis added), *citing Ray v. Alad Corp.*, 19 Cal.3d 22, 31, 136 Cal.Rptr. 574, 579–80, 560 P.2d 3, 8–9 (1977). Plaintiff's claim is not premised on Thomson's sale of an allegedly defective product. The "product line" theory therefore is inapplicable.