**Daniel FREEMAN, Plaintiff,**

v.

**COMPLEX COMPUTING COMPANY, INC., et al., Defendants.**

**No. 95 Civ. 3811(LAK).**

United States District Court,
S.D. New York.

Oct. 14, 1997.

Barbara E. Olk, Trief & Olk, New York City, for plaintiff.

Richard B. Cohen, Akabas & Cohen, New York City, for defendants Complex Computing Co., Inc. and Jason Glazier.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The principal issue presented by this case is whether the corporate veil of an entity known as Complex Computing Co., Inc. ("C3") may be pierced to require Jason Glazier, C3's equitable owner, to arbitrate the plaintiff's claim against him. This Court previously held that it may and directed Glazier to arbitrate.[1] The Court of Appeals, although largely affirming the previous decision, has remanded for the purpose of this Court making a finding as to "whether Glazier used his control over C3 to commit a fraud or other wrong that resulted in an unjust loss or injury to Freeman."[2]

### Facts

The facts are largely set out in the prior opinions of this Court and the Court of Appeals and need not be repeated. It is necessary only to summarize Freeman's contract with C3 and to place it in the broader context of the present dispute.

### The Freeman Contract

On September 30, 1993, Freeman entered into an agreement with C3 pursuant to which he agreed to serve as an independent sales representative. Section 4 of the contract provided in relevant part that C3:

"shall pay to [Freeman] 20% of all Revenues (hereinafter defined) on a Commissionable Sale (hereinafter defined) during the seven years after the closing of such sale, and 10% of all Revenues on a Commissionable Sale during the three years next succeeding such seven-year period, except that such commissions shall be 10% and 5% with respect to Commissionable Sales made during the three-month period commencing six months after the expiration of the full Term or following its earlier termination under Section 5 hereof. 'Revenues' means gross revenues received on a Commissionable Sale during the specified time period immediately succeeding the date of the execution of a binding agreement or other closing of such Commissionable Sale, in respect of the Product ... 'Commissionable Sales' means sales or licensings of the Product or any part of it by the Company, for which a binding agreement is executed during the Term or during the nine-month period immediately following the expiration of the full Term ... to customers satisfying each of the following conditions: (a) the customer is listed on Schedule 1 hereto (all references to Schedule 1 mean Schedule 1 as amended from time to time, provided that it may not be amended at any time without the written consent of the Company); and (b) [Freeman] shall have performed material sales, marketing and/or negotiating services necessary to secure the sale of the Product to such customer ... "

In broad summary, then, Freeman was to receive with respect to all sales that he brought about to customers listed on Schedule 1 (a) 20 percent of the gross revenues for the first seven years, and (b) 10 percent of the gross revenues for the next three years.

The agreement contemplated the possibility that C3 would acquire, merge with or be acquired by a customer, an event that could cut off the flow of sales revenues notwithstanding that the customer would continue to have the benefit of C3's product. Section 8 therefore provided in relevant part that:

"During the term of this Agreement, if the Company makes a Commissionable Sale that does not result in any Revenues because the Company effects a merger, consolidation, or stock acquisition transaction with the party to whom such Commissionable Sale was made, then in lieu of any commission in respect thereof, the Compa-

---

1. *Freeman v. Complex Computing Co., Inc.,* 931 F.Supp. 1115 (S.D.N.Y.1996), *aff'd in part and remanded,* 119 F.3d 1044 (2d Cir.1997).

2. 119 F.3d at 1053.

ny shall pay to [Freeman] an amount equal to 10% of the total consideration conveyed in such merger, consolidation or stock acquisition transaction."

In other words, if C3 entered into a business combination that would deprive Freeman of commissions contemplated by Section 4, Freeman would be entitled to receive an amount equal to 10 percent of the deal.

### The Thomson Transactions

On August 18, 1994, C3 entered into an agreement pursuant to which it granted Thomson Trading Systems, Inc. exclusive worldwide sales and marketing rights for its product with respect to non-broker/dealer customers.[3] As the Court of Appeals noted, Thomson was among the entities listed on Schedule 1 of the Freeman–C3 agreement, and an amendment to that contract acknowledged that Freeman "has performed—and will continue to perform—material marketing services" with respect to the customers so listed.[4] Freeman therefore had at least a claim that he would be entitled to 20 percent of all revenues generated by sales to Thomson over the next seven years and 10 percent for three years thereafter.

The potentially lucrative returns to Freeman in light of the August 1994 Thomson transaction evidently caused Glazier to rethink his relationship with Freeman. In October 1994, C3 gave Freeman 60–days notice of termination of the Freeman–C3 agreement. The letter of termination, signed by Glazier, explained that the decision to terminate Freeman was "an action to combat the overly generous termination clause we committed to, and to force renegotiation of your sales contract." [5]

Having disposed of Freeman, Glazier then entered into another and farther reaching transaction with Thomson. In January 1995, Thomson (a) purchased substantially all of the assets[6] and assumed—save C3's obligations to Freeman—most of the liabilities of C3 for $300,000, (b) hired Glazier as vice president and director of research and development at a starting salary of $150,000 plus additional payments of "incentive compensation" based in part upon revenues received by Thomson in connection with the sale or license of products developed by Glazier, and (c) paid Glazier a "signing bonus" of $450,-000. C3 agreed to indemnify Thomson against losses attributable to the breach of any warranty, covenant or representation made by it in the asset purchase agreement, any infringement of the rights of third parties by the intellectual property sold to Thomson, and any liability or obligation of C3 not assumed by Thomson, which of course included the Freeman contract. One third of the purchase price, $100,000, was held in escrow as a reserve against claims on the indemnity.

### The Effect of the Transactions on Freeman

Immediately prior to his termination by C3, Freeman had at least a claim to a substantial share of the gross revenues that would be generated by future C3 sales to Thomson, as well as other customers, over a ten year period. The entity liable to him on any such claim was C3, which owned valuable computer software and which of course would get the lion's share of any such revenues from sales to Thomson and others. In consequence, Freeman had every reason to expect that C3 would be able to pay any commissions ultimately due to him.

The C3–Thomson transaction and its sequelae changed all that. C3's assets were transferred to Thomson in exchange for $300,000, $100,000 of which was held in escrow in order to satisfy a host of potential claims that Thomson might have against C3. By the fall of 1995, even viewing the evidence in the light most favorable to Glazier, C3 was out of business and left with only $10,000 in cash, a product in development of which no sales yet had been made, and a claim to whatever part of the $100,000 escrow was not consumed by any claims for indemnification

**3.** Akabas Aff., Nov. 17, 1995, Ex. L. at ¶ 2.

**4.** 119 F.3d at 1047; Olk Aff., Nov. 17, 1995, Ex. L.

**5.** Olk Aff., Nov. 17, 1995, Ex. L.

**6.** Akabas Dep. 50–52.

by Thomson.[7]  Hence, Freeman was left as a general creditor of an essentially defunct corporation with virtually no assets.

### Discussion

*Fraud or Other Wrong Resulting in Injury*

■ The majority opinion in the Court of Appeals stated that "there is substantial evidence of . . . wrongdoing" by Glazier, although it concluded that a finding on that issue should be made in the first instance by the district court.[8]  Judge Godbold's separate opinion disagreed only to the extent that he regarded the fraud or wrongful injury as having been established as a matter of law.[9]  In conformity with the mandate of the Court of Appeals, this Court now finds that Glazier's actions constituted fraud or other wrongful behavior and resulted in injury to Freeman.[10]

The facts giving rise to this conclusion are plain and undisputed. Glazier caused his company, C3, to enter into an agreement with Freeman pursuant to which it was obliged to pay Freeman generous commissions for years to come.  Freeman then played a role in procuring the Thomson business for C3, a role for which he was entitled to possibly substantial compensation over a long period.  Glazier then concluded that the compensation that C3 had agreed to pay Freeman was too liberal, so he terminated Freeman's contract "to force [its] renegotiation."  Having gotten rid of Freeman, he then caused C3 to convey the bulk of its assets to Thomson, obtained substantial financial benefits for himself, and left Freeman with a claim against a non-operating company with very limited assets.

Glazier resists this conclusion principally on the basis that there was no injury to Freeman because C3 was left with at least $110,000 in assets and Freeman's claim could not possibly exceed that amount.[11]  The argument proceeds from the premise that the only sales in respect of which Freeman could be entitled to commissions would be sales to Thomson.[12]  Glazier then points to Section 8 of the C3–Freeman agreement and argues that the Thomson acquisition gave Freeman the right, in lieu of commissions on sales to Thomson, only to 10 percent of the purchase price, which he contends was no more than $850,000, or $85,000.[13]  To this he adds an additional $25,000 concededly owed in respect of a prior sale to Chemical Bank.[14]  He argues that Freeman's claim against C3, even viewed in the light most favorable to him, cannot exceed $110,000 and that Freeman therefore was not injured by Glazier's machinations.  The argument is entirely without merit.

To begin with, the assumption that the only sales that could generate a right to commissions would be sales to Thomson is incorrect.  The contract gave Freeman a right to commissions on sales to a range of other customers as well.  The complaint alleges that C3 made commissionable sales to Chemical Bank, Bankers Trust, Bear Stearns and Smith Barney–Shearson, among others, as a result of Freeman's efforts.  Hence, even if Section 8 of the C3–Freeman agreement limited Freeman's claim in respect of sales to Thomson to $85,000, as Glazier

---

7.  Akabas Dep. 50–52.  All but $10,000 of the $200,000 cash portion of the Thomson purchase price was disbursed, at least $180,000 to Glazier and the counsel who represented him personally in the Thomson transaction. *Id.* at 51–66.

8.  119 F.3d at 1053.

9.  *Id.* at 1054.

10.  Glazier argues that any finding of fraud must be made by clear and convincing evidence, the standard applicable under New York law.  As this matter is governed by the Federal Arbitration Act, it is far from clear that the New York standard applies.  It is unnecessary to determine the point, as the Court's finding would be the same under either standard.

11.  Glazier Mem., Oct. 3, 1997, at 10–15.

12.  *E.g., id.* at 14.

13.  Glazier actually argues that the purchase price could not have exceeded $750,000, the total of the price allocated to the assets and Glazier's signing bonus.  The additional $100,000 is attributed to incentive compensation, *id.* at 13–14, although the derivation of the figure is obscure.

14.  Glazier's brief concedes that Freeman is owed $25,000 from an earlier license to Chemical Bank. *Id.* at 13 n. 10.  It is not clear whether this $25,000 is owed under the C3–Freeman agreement at issue here or another agreement.

claims,[15] it would not affect his right to 20 percent of the revenues from sales to these other entities for seven years and to 10 percent for three years thereafter.

Second, in asserting that C3 was left with at least $110,000 in assets, Glazier includes in that figure the entire $100,000 held in escrow to secure Thomson's claims against C3 under the indemnity provision of the asset purchase agreement.[16] But that makes little sense. By the terms of the indemnity, the $100,000 was to be available to satisfy claims *by Thomson* for breach by C3 of (a) any warranty, covenant or representation made by it in the asset purchase agreement, (b) any infringement of the rights of third parties by the intellectual property sold to Thomson, and (c) any liability or obligation of C3 not assumed by Thomson, which of course included the Freeman contract. Even if one were to assume that there was no real risk of a claim by Thomson under (a) or (b), a proposition as to which Glazier has offered no evidence, the risk of a suit by Freeman that would include Thomson was palpable. The indemnity at least arguably required C3 to pay Thomson's costs in defending such an action, which easily could have consumed all or much of the $100,000 escrow fund.[17] Hence, even if Glazier clearly were right in asserting that the maximum liability to Freeman could not exceed $110,000, the assets left in C3 to deal with such a claim—given the potential competing claims on them—were insufficient.

In view of the foregoing considerations, the Court finds that the transactions engaged in by C3 and Glazier were intended to impair Freeman's ability to enforce C3's obligations to him, that the assets left in C3 were inadequate to the purpose, and that Glazier "used his control over C3 to commit a fraud or other wrong that resulted in an unjust loss or injury to Freeman."[18]

*Glazier's Belated Request for a Trial*

■ Glazier now contends also that he is entitled to a trial on the issue remanded to this Court. The argument ignores both the history of this matter and the lack of a genuine issue for trial.

This action was commenced by Freeman in May 1995 against Glazier, C3 and Thomson. The defendants promptly moved to stay the litigation pending the outcome of a Freeman–C3 arbitration. Freeman cross-moved to compel all of the defendants to arbitrate. The Court then permitted the parties to conduct discovery with respect to the question whether Glazier was bound by the arbitration clause in the Freeman–C3 agreement, scheduled the submission of papers following the conclusion of discovery, and indicated that it then would determine whether an evidentiary hearing would be required.[19]

Despite the Court's September 1995 indication that the need for an evidentiary hearing would be determined after the conclusion of discovery, Glazier never sought such a hearing. Glazier's position, insofar as it is relevant here, was that Freeman had not pleaded the alleged fraud with particularity and, in any case, that Freeman's evidence showed no fraudulent act.[20] Glazier's affidavit did not address the plaintiff's veil piercing claim except to state that he was not an

---

**15.** Even that is doubtful. In addition to the price paid for the C3 assets and the signing bonus. Glazier is entitled to a salary and substantial incentive compensation from Thomson. Glazier's argument assumes, perhaps incorrectly, that no part of the salary and incentive compensation is attributable to the sale of C3's assets for purposes of the C3–Freeman agreement. *Id.* at 14 n. 11.

**16.** *Id.* at 14–15.

**17.** Glazier has represented that Thomson has waived any claim against the escrow with respect to the cost of defending this action. The question whether C3 was left with assets adequate to cover Freeman's potential claim, however, must be assessed as of the date of the C3–Thomson transaction, January 1995. There is no claim that Thomson made any such waiver at that point.

**18.** *Freeman v. Complex Computing Co., Inc.,* 119 F.3d 1044, 1053 (2d Cir.1997).

**19.** Tr., Sept. 29, 1995, at 27–28.

**20.** *E.g.,* Memorandum in Opposition to Plaintiff's Cross–Motion Seeking Arbitration As Against Glazier, Nov. 17, 1995, at 10–13; Cohen Aff., Dec. 7, 1995, ¶¶ 16–18; Glazier Mem., Dec. 7, 1995, *passim.*

employee, shareholder, director or officer of C3.[21] He thus evidenced his willingness to have the issue decided on the record presented to the Court prior to its 1996 decision and certainly raised no objection to that procedure. Having gambled on a decision in his favor on the motion record, Glazier will not be heard now to contend that he is entitled to an evidentiary hearing before any decision may be rendered against him.[22]

■ The Court would reach the same result even if Glazier had not waived a hearing. The issue here is whether the arbitration agreement between Freeman and C3 is binding on Glazier—in other words, whether there is an arbitration agreement between Glazier and Freeman within the meaning of Section 4 of the Federal Arbitration Act.[23] A party contesting the existence of an agreement to arbitrate is entitled to a trial on the point only if there is a "genuine issue" of fact.[24] "To establish a genuine issue entitling a party to a jury trial, 'an unequivocal denial that the agreement [to arbitrate] had been made [is] needed, and some evidence should [be] produced to substantiate the denial.' "[25]

In this context, Glazier could establish a genuine issue for trial only by unequivocally denying that he is a party to the arbitration agreement and supporting that position with evidence.[26] This he has failed to do, and thus

there is no genuine issue for trial. Glazier concededly fired Freeman to force him to renegotiate his contract, a contract that Glazier thought too generous to Freeman. He was party to structuring the deal with Thomson in such a way as to strip C3 of the means of satisfying any substantial judgment or award that Freeman might obtain. Glazier certainly has come forward with no "unequivocal denial" that his purpose in doing so was at least to exert further pressure on Freeman, if not to leave him substantially remediless. Nor has he produced any evidence to substantiate his claim that the assets left in C3 were adequate to satisfy any reasonably foreseeable claim by Freeman. Having failed to come forward with an adequate denial and supporting evidence, Glazier has failed to establish the existence of a genuine issue for trial.

*Conclusion*

For the foregoing reasons, this Court finds that Glazier is obliged to arbitrate Freeman's claim against him. Accordingly, judgment shall enter compelling plaintiff, C3 and Glazier to arbitrate their disputes in accordance with the contract between plaintiff and C3. As the plaintiff's claims against Thomson have been stayed and placed on the suspense docket pending final determination of the arbitration among plaintiff, C3 and Glazier,

21. Glazier Aff., Aug. 12, 1995, ¶ 2.

22. *See, e.g., Consol. Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989) (party resting opposition to preliminary injunction motion on affidavits waived right to evidentiary hearing); *Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745, 748 (2d Cir.1987) (same); *Holt v. Continental Group, Inc.,* 708 F.2d 87, 90 n. 2 (2d Cir.1983) (party which "elects to gamble on a 'battle of affidavits' must live by that choice"); *Drywall Tapers & Pointers v. Operative Plasterers' and Cement Masons' Int'l Ass'n,* 537 F.2d 669, 674 (2d Cir.1976) (same); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1204–05 (2d Cir.1970) (same).

23. 9 U.S.C. § 4. *See, e.g., McAllister Bros., Inc. v. A. & S. Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980) ("As we have previously held, the question 'whether a person is a party to [an] arbitration agreement ... is included within the statutory issue of the making of the arbitration

agreement.' ") (citing *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 677 (2d Cir.1972) (internal quotation marks omitted)).

24. *E.g., Doctor's Assoc., Inc. v. Jabush,* 89 F.3d 109, 114 (2d Cir.1996); *Doctor's Assoc., Inc. v. Stuart,* 85 F.3d 975, 983–84 (2d Cir.1996); *Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.,* 663 F.2d 4, 7 (2d Cir.1981) (quoting *Almacenes Fernandez, S.A. v. Golodetz,* 148 F.2d 625, 628 (2d Cir.1945)).

25. *Doctor's Assoc., Inc. v. Jabush,* 89 F.3d at 114 (quoting *Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.,* 663 F.2d at 7 (quoting *Almacenes Fernandez, S.A. v. Golodetz,* 148 F.2d at 628) (internal quotations omitted)).

26. In other words, Glazier must unequivocally deny the factual premises of Freeman's contention that the C3 corporate veil should be pierced and point to evidence substantiating that view.

the Clerk is directed to close the file in this matter.

SO ORDERED.