Daniel FREEMAN, Plaintiff–Appellee–
Cross–Appellant,

v.

COMPLEX COMPUTING COMPANY,
INC., Defendant,

Jason Glazier, Defendant–Appellant,

Thomson Trading Services, Inc.,
Defendant–Cross–Appellee.

Nos. 931, 1133, Dockets 96–7850, 96-7870.

United States Court of Appeals,
Second Circuit.

Argued March 24, 1997.

Decided Aug. 7, 1997.

Richard B. Cohen, Akabas & Cohen, New York City (Jeffrey T. Horvath, Akabas & Cohen, New York City, of counsel), for Defendant–Appellant.

Barbara E. Olk, Trief & Olk, New York City (Ted Trief, Trief & Olk, New York City, of counsel), for Plaintiff–Appellee–Cross–Appellant.

James F. Rittinger, Satterlee Stephens Burke & Burke LLP, New York City (John L. Slafsky, Satterlee Stephens Burke & Burke LLP, New York City, of counsel), for Defendant–Cross–Appellee.

Before: NEWMAN, Chief Judge, MINER and GODBOLD,[*] Circuit Judges.

Judge GODBOLD concurs in part, and dissents in part, in a separate opinion.

MINER, Circuit Judge:

Defendant-appellant Jason Glazier appeals from a judgment entered in the United States District Court for the Southern District of New York (Kaplan, J.) to the extent that the judgment compels him to arbitrate the claims made against him by plaintiff-appellee-cross-appellant Daniel Freeman. The claims were asserted under the provisions of a contract between Freeman and defendant Complex Computing Company, Inc. ("C3"). The court found that, although Glazier was neither an employee, officer, director, nor shareholder of C3, his control and dominion over C3 warranted the piercing of the corporate veil in order to impose personal liability upon him. Freeman cross-appeals from so much of the judgment as denies his motion to compel arbitration of his claims against defendant Thomson Trading Services, Inc. ("Thomson"), a corporation that purchased the assets of C3, stays his claims against Thomson pending the final determination of the arbitration as to Glazier and C3, and places on the suspense docket those matters not otherwise disposed of by the district court's judgment.

For the reasons that follow, we affirm in part and reverse in part.

## BACKGROUND

While pursuing graduate studies under a fellowship at Columbia University in the early 1990s, Glazier co-developed computer software with potential commercial value and negotiated with Columbia to obtain a license for the software. Columbia apparently was unwilling to license software to a corporation of which Glazier was an officer, director, or shareholder. Nonetheless, Columbia was willing to license the software to a corporation that retained Glazier as an independent contractor. The licensed corporation then could sublicense the product to others for profit.

Accordingly, in September of 1992, C3 was incorporated, with an acquaintance of Glazier's as the sole shareholder and initial director, and Seth Akabas (a partner of Glazier's counsel in this action) as the president, treasurer and assistant secretary. In November of 1992, another corporation, Glazier, Inc., of which Glazier was the sole shareholder, entered into an agreement with C3 (the "consulting agreement").[1] Under the consulting agreement, Glazier, Inc. was retained as an independent contractor (titled as C3's "Scientific Advisor") to develop and market Glazier's software, which was licensed from Columbia, and to provide support services to C3's clients. Glazier was designated the sole signatory on C3's bank account, and was given a written option to purchase all of C3's stock for $2,000.

In September of 1993, C3 entered into an agreement with Freeman (the "C3–Freeman Agreement"), under which Freeman agreed to sell and license C3's computer software products for a five-year term. In exchange,

---

[*] The Honorable John C. Godbold of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. Although the consulting agreement was between C3 and Glazier, Inc., numerous provisions in the agreement made express reference to Glazier personally. For example, the consulting agreement provided that it was terminable if Glazier himself was unable to perform or supervise performance of Glazier, Inc.'s obligations. Also, the agreement defined the royalties to which Glazier, Inc. was entitled as revenues received by C3 in connection with products developed, or services rendered, by Glazier, Inc. or by Glazier personally.

C3 agreed to pay Freeman commissions on the revenue received by C3 over a ten-year period from the client-base developed by Freeman, including the revenue received from sales and licensing, maintenance and support services. The C3–Freeman Agreement included provisions relating to Freeman's compensation if C3 terminated the agreement prior to its expiration, or if C3 made a sale that did not result in revenues because of a future merger, consolidation, or stock acquisition. The agreement included an arbitration clause,[2] as well as a provision that the entire agreement would be binding upon the heirs, legal representatives, successors and assigns of the parties.

Schedule 1 of the C3–Freeman Agreement listed the customers from whom Freeman would receive commissions. Although C3's president signed the C3–Freeman Agreement, Glazier personally signed the periodic amendments to Schedule 1. On March 24, 1994, Glazier signed an amended Schedule 1 that listed as customers, among numerous others, Thomson Financial, Banker's Trust and Chemical Bank. The amendment provided that "[t]o date, Dan Freeman has performed—and will continue to perform—material marketing services" as regards these customers.

On August 22, 1994, C3 and Thomson Investment Software, a unit or affiliate of Thomson, entered into a licensing agreement that granted Thomson exclusive worldwide sales and marketing rights of C3's products. Freeman contends that the licensing agreement resulted from efforts made by him over approximately nine months to bring the transaction to fruition.

In October of 1994, C3 gave Freeman the requisite 60–days notice of the termination of its agreement with him. The letter of termination, signed by Glazier, explained that C3's exercise of its option to terminate Freeman's employment was "an action to combat the overly generous termination clause we committed to, and to force a renegotiation of your sales contract."

Glazier was hired in January of 1995 as Thomson Investment Software's Vice President and Director of Research and Development at a starting salary of $150,000 plus additional payments of "incentive compensation" based in part upon the revenues received by Thomson in connection with the sale or license of products developed by Glazier. On the same day, Thomson and C3 entered into an assets purchase agreement (the "Thomson Agreement" or "assets purchase agreement"). As part of the transaction, Thomson assumed C3's intellectual products, trademarks and tradenames. It also assumed most of the liabilities and obligations of existing agreements involving C3, including agreements with C3 customers such as Banker's Trust and Chemical Bank. The Thomson Agreement set forth a list of C3 agreements assumed by Thomson, but expressly excluded the C3–Freeman Agreement. Thomson paid a total of $750,000, from which Glazier was paid $450,000 as a "signing bonus" in connection with his new employment contract; and C3 was paid $300,000, $100,000 of which was held by Thomson in an escrow account to indemnify Thomson for legal expenses in defending itself against claims arising from the assets purchase agreement, as well as for other expenses.

In May of 1995, Freeman commenced the action giving rise to this appeal. Named as defendants were C3, Thomson, and Glazier. In his complaint Freeman alleged that C3 and Thomson terminated the August 22, 1994, licensing agreement and entered into the assets purchase agreement with the specific intent of depriving him of commissions due. Freeman asserted claims against C3 and, on successor liability theories, Thomson, for breach of contract. He sought relief from Glazier and Thomson for inducement of C3's alleged breach of contract and on a fraudulent conveyance theory. He estimated that he currently was due more than $100,-

---

**2.** Section 13 provided:

Any controversy or claim arising out of or related to this Agreement or any breach hereof [with an exception not here relevant] shall be settled by arbitration in accordance with the rules of the American Arbitration Association in New York, NY, and judgment upon such award rendered by the Arbitrator may be entered in any court having jurisdiction thereof.

000, and that the moneys due him in the future under the agreement would be in excess of $5 million.

Pursuant to 9 U.S.C. § 3, defendants responded by seeking a stay of the action pending arbitration. Defendants contended that Freeman was obliged to arbitrate his claims against C3 in accordance with the terms of the C3–Freeman Agreement, and that the claims against Thomson and Glazier should not proceed until the arbitration was concluded. Freeman then moved to compel all three defendants to arbitrate, asserting that Glazier and Thomson were obliged to arbitrate on the theory that they were alter egos of, or successors in interest to, C3. Defendants countered that the arbitration clause in the agreement did not bind either Glazier or Thompson because neither one was a signatory to the C3–Freeman Agreement.

In a memorandum opinion dated June 28, 1996, the district court found that both C3 and Glazier should be compelled to arbitrate their disputes with Freeman in accordance with the C3–Freeman Agreement. The district court found that Glazier was subject to the arbitration clause of the C3–Freeman Agreement because he "did not merely dominate and control C3—to all intents and purposes, he was C3" and because he held the "sole economic interest of any significance" in the corporation. *Freeman v. Complex Computing Co., Inc.*, 931 F.Supp. 1115, 1120 (S.D.N.Y.1996). The district court intended the judgment to "dispose[ ] of all claims asserted herein between and among [Freeman, C3 and Glazier]." *Id.* at 1124.

Freeman's motion to compel arbitration of his claims against Thomson was denied, however, and Freeman's claims against Thomson were stayed pending the final determination of the arbitration. Freeman had argued that the district court should hold Thomson liable as C3's successor under each of four exceptions to the general rule that a corporation is not responsible for the debts and liabilities of its predecessor, specifically: (1) there was an express or implied assumption of the predecessor's liabilities; (2) there was a consolidation or merger of seller and purchaser; (3) the purchaser was a mere continuation of

seller; and (4) the transaction was fraudulently entered into in order to escape obligations. The district court rejected each of these arguments.

First, the district court rejected Freeman's "assumption of liability" argument. It reasoned that it should not infer the existence of an obligation contradictory to the terms of the assets purchase agreement under which Thomson expressly declined responsibility for the C3–Freeman Agreement. Second, the district court rejected Freeman's "merger" argument. It found that, "given that there is no continuity of ownership, physical location, management, assets, or personnel, nor a dissolution of C3, there has not been a *de facto* merger." *Id.* at 1122. Third, the district court rejected Freeman's contention that Thomson was a mere continuation of C3. The district court reasoned that because C3 continues to exist as a separate entity, Thomson could not be viewed merely as a continuation of C3. Finally, the district court rejected Freeman's argument that the assets purchase agreement constituted a "fraudulent transfer" entered into by the parties in order to escape existing obligations. The district court recognized that Freeman's theory depended upon the acceptance of his contention that somehow Thomson knew Glazier would remove the proceeds of the assets purchase from C3, thus rendering C3 unable to honor its alleged obligations to Freeman under the C3–Freeman Agreement. The district court rejected this contention because it found that Freeman offered no evidentiary support for his allegation that Thomson had the requisite knowledge.

In accordance with the foregoing, the district court denied Freeman's motion to compel Thomson to arbitrate and stayed Freeman's claims against Thomson pending the outcome of the arbitration among Freeman, C3 and Glazier. It placed on the suspense docket so much of the proceeding as was not otherwise disposed of by its memorandum opinion. Accordingly, judgment was entered on July 8, 1996, directing Freeman, C3 and Glazier to proceed to arbitration. This appeal and cross-appeal followed.

## DISCUSSION

### I. Appellate Jurisdiction

#### A. Jurisdiction Over the Cross–Appeal

 In making the motions giving rise to the judgment of the district court, both Freeman and the defendants cited section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, as authority for the relief sought. Section 3 provides in part:

> If any suit or proceeding be brought ... upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had....

On his motion, Freeman contended that his claims against Glazier were referable to arbitration under the C3–Freeman Agreement on a veil-piercing theory and that his claims against Thomson were referable to arbitration under the Agreement on a successor liability theory. Freeman prevailed on the former theory but not on the latter. He contends in his cross-appeal that the court erred in failing to order Thomson to proceed to arbitration on his claims against it.

Section 16 of the FAA provides that "[a]n appeal may be taken from ... an order ... denying a petition under section 4 of this title to order arbitration to proceed." 9 U.S.C. § 16(a)(1)(B). Section 4 relates to the procedure to be followed in applications made to a court to compel arbitration. It is apparent that Freeman's cross-appeal is from an order denying a petition under section 4 and that immediate review of that order may be had under the provisions of 9 U.S.C. § 16(a)(1)(B).

#### B. Jurisdiction Over the Appeal

 The district court accepted Freeman's veil-piercing theory in ordering Glazier to arbitrate despite Glazier's status as a nonsignatory to the C3–Freeman Agreement. *See Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995). Glazier's appeal is from so much of the judgment

as orders him to proceed to arbitration. We ordinarily lack jurisdiction over an appeal from an order compelling arbitration in an "embedded" proceeding. *See* 9 U.S.C. § 16(b)(2) ("an appeal may not be taken from an interlocutory order ... directing arbitration to proceed under section 4 of this title"); *see also Filanto, S.p.A. v. Chilewich Int'l Corp.*, 984 F.2d 58, 60–61 (2d Cir.1993) ("If the suit is 'embedded,' *i.e.*, a party has sought some relief other than an order requiring or prohibiting arbitration (typically some relief concerning the merits of the allegedly arbitrable dispute)," an order compelling arbitration is not appealable "until the arbitration has occurred and its result is available for challenge on a motion to confirm or vacate the award.").

 While the order staying the action as to Freeman's claim against Glazier and directing arbitration of that claim therefore is not ordinarily appealable, it is appropriate for us to exercise pendent appellate jurisdiction over the appeal in this case because of the overlap in the factors relevant to our consideration of the appealable and non-appealable issues presented. "[U]nder the doctrine of pendent appellate jurisdiction, once we have taken jurisdiction over one issue in a case, we may, in our discretion, consider other nonappealable issues in the case as well...." *San Filippo v. U.S. Trust Co. of N.Y.*, 737 F.2d 246, 255 (2d Cir.1984). We recognize that a careful exercise of our discretion is required. *See Swint v. Chambers County Comm'n*, 514 U.S. 35, 49, 115 S.Ct. 1203, 1211, 131 L.Ed.2d 60 (1995) (cautioning that "a rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay [appealable] collateral orders into multi-issue interlocutory appeal tickets").

Applying the cautionary advice of *Swint*, we have determined that we would exercise pendent appellate jurisdiction only "over an independent but related question that is 'inextricably intertwined' with the [appealable issue] or is 'necessary to ensure meaningful review' of that issue." *Kaluczky v. City of White Plains*, 57 F.3d 202, 207 (2d Cir.1995) (quoting *Swint*, 514 U.S. at 51, 115 S.Ct. at 1212). In *Kaluczky*, we concluded that the

issues on appeal were "inextricably intertwined" within the meaning of *Swint* because "there [was] sufficient overlap in the factors relevant to the appealable and nonappealable issues to warrant our exercising plenary authority over the appeal." *Id.* (internal quotation omitted).

In an earlier case, *McCowan v. Sears, Roebuck & Co.*, 908 F.2d 1099 (2d Cir.1990), we found sufficient overlap in the appeals of Dean Witter Reynolds, Inc. ("Dean Witter") and Sears, Roebuck & Co. ("Sears") to warrant the exercise of pendent appellate jurisdiction. The plaintiffs' complaint against Dean Witter and Sears was predicated on the same transactions. The plaintiffs, who had entered into an agreement containing an arbitration provision with Dean Witter, alleged "controlling person liability" against Sears. The district court denied the motions of both Dean Witter and Sears for a stay of proceedings pending arbitration between the plaintiffs and Dean Witter. Both parties appealed. Despite a procedural default on the part of Dean Witter in filing its notice of appeal, we exercised pendent appellate jurisdiction over its appeal.

■ Similarly, both the appeal and the cross-appeal in the case before us require analysis of the C3–Freeman Agreement and its provision for arbitration. There is substantial factual overlap bearing on the issues raised on the appeal and the cross-appeal. The machinations of Glazier with respect to the evasion of payment to Freeman must be examined. Glazier acted through Glazier, Inc. and C3 to insulate himself from personal liability to Freeman and thereafter entered into an agreement with Thomson also arguably designed to insulate himself from such liability. As in *McCowan*, the appropriateness of a stay pending arbitration requires an examination of the relationship between two defendants, here Glazier and Thomson. The issues of successor liability and veil-

piercing are inextricably intertwined as the result of the relationships among Freeman, Glazier and Thomson, and meaningful review cannot be had of the Freeman cross-appeal without the exercise of pendent appellate jurisdiction over Glazier's appeal.[3]

We are mindful of the recent determination of the Seventh Circuit that section 16(b) precludes the exercise of pendent appellate jurisdiction over orders staying federal court proceedings pending arbitration. *See IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 528 (7th Cir.1996). We respectfully disagree, finding in the FAA no indication by Congress that the long-standing doctrine of pendent appellate jurisdiction is totally eliminated as to appeals of orders staying federal court proceedings pending arbitration. *IDS* itself expresses some uncertainty as to the holding. *See id.* ("Congress may have precluded the application of the doctrine of pendent appellate jurisdiction to those orders. We cannot be certain of this.").

In the final analysis, *IDS* comes down on the side of preclusion upon a finding of congressional policy of "support for facilitating arbitration in order to effectuate private ordering and lighten the caseload of the federal courts." *Id.* Although the FAA clearly manifests support for these goals, we do not think that Congress has demonstrated any interest in interfering with a judicially-created doctrine that has served to conserve judicial resources and save time and work for litigants. In this case, resolution of the appeal together with the cross-appeal will facilitate arbitration by defining the issues to be arbitrated as well as identifying the proper participants in the arbitration. The goals envisioned by Congress in enacting section 16 of the FAA will therefore be advanced by the application of pendent appellate jurisdiction in this case.

---

**3.** An additional basis for the exercise of pendent appellate jurisdiction is as follows: Freeman has, in effect, amended his complaint to abandon his claims against Glazier and C3 and replace them with a claim for arbitration. As to these defendants, the claim for arbitration is like an independent action for arbitration, in which an order to arbitrate is immediately appealable. *See Fi-*

*lanto, S.p.A.*, 984 F.2d at 60 (In an independent proceeding, i.e., one where "the plaintiff seeks an order compelling or prohibiting arbitration or a declaration that a dispute is arbitrable or not arbitrable, and no party seeks any other relief, ... the objecting party need not await the outcome of the arbitration before challenging the order to arbitrate." (citations omitted)).

## II. Piercing the Corporate Veil

Glazier argues on appeal that the district court erred in piercing the corporate veil to compel him to arbitrate Freeman's claims pursuant to the arbitration provision of the C3–Freeman Agreement. First, he contends that he cannot be held liable on a veil-piercing theory because he is neither a shareholder, officer, director or employee of C3. Second, Glazier argues that the district court's determination that he controlled C3 does not justify piercing the corporate veil in the absence of a factual finding that he used his control over C3 to wrong Freeman. We reject the former contention, but agree that the district court erred in piercing the corporate veil before finding that Glazier used his domination of C3 to wrong Freeman.

Neither party disputes that New York law applies to these issues. We review *de novo* the district court's legal conclusions. *See, e.g., Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1029 (2d Cir.1995).

### A. Glazier's Equitable Ownership of C3

■ Glazier contends that he should not be held personally liable under a veil-piercing theory because he is not a shareholder, officer, director, or employee of C3. We reject this argument.

■ New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over the corporation may be deemed an "equitable owner", notwithstanding the fact that the individual is not a shareholder of the corporation. *See, e.g., Guilder v. Corinth Constr. Corp.*, —— A.D.2d ——, ——, 651 N.Y.S.2d 706, 707 (3d Dep't 1997) ("Even if the [principals] were not [the corporation]'s legal owners, it is apparent that they dominated and controlled the corporation to such an extent that they may be considered its equitable owners."). As the Appellate Division explained in *Lally v. Catskill Airways, Inc.*, a nonshareholder defendant may be, "in reality," the equitable owner of a corporation where the nonshareholder defendant "exercise[s] considerable authority over [the corporation] ... to the point of completely disregarding the corpo-

rate form and acting as though [its] assets [are] his alone to manage and distribute." 198 A.D.2d 643, 603 N.Y.S.2d 619, 621 (3d Dep't 1993).

Equitable ownership has been recognized for veil-piercing purposes. *See Mediators, Inc. v. Manney*, No. 93 Civ. 2304, 1996 WL 554576, at *5 (S.D.N.Y. Sept.30, 1996) (citing *Lally* in determining that a nonshareholder could "only be held liable under an alter ego theory if she was an equitable owner" (internal quotation and alteration omitted)); *cf. Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 343 (2d Cir.1986) (in maritime case, defendant who claimed to be no more than a creditor of the dominated entity was personally liable where defendant treated the entity as his alter ego and used it for fraudulent purposes); *In re MacDonald*, 114 B.R. 326, 332–33 (D.Mass.1990) (piercing the corporate veil in bankruptcy case to establish debtor as the equitable owner of corporate stock that ostensibly was owned by debtor's father, and therefore finding stock subject to turnover order); *In re Charnock*, 97 B.R. 619, 628 (Bankr.M.D.Fla.1989) (finding the following factors to be considered in determining that the debtor, who was neither a shareholder, officer or director, was the equitable owner: the debtor's "dominion control over the assets and affairs of these entities and the total lack of involvement ... by the president and sole stockholder," and the debtor's repeated representations to the public that he owned the assets and was in sole control of the entities).

Because Glazier "exercised considerable authority over [the corporation] ... to the point of completely disregarding the corporate form and acting as though [its] assets were his alone to manage and distribute," *see Lally*, 603 N.Y.S.2d at 621, he is appropriately viewed as C3's equitable owner for veil-piercing purposes. If there were board meetings, no minutes were kept from August 1994 through May 1995. Glazier agreed to personally indemnify C3's sole shareholder and director against any liability arising from the performance of his duties as C3's director. The president of C3 never attended a meeting of the Board of Directors. No shareholder received dividends or other dis-

tributions, despite the corporate income of $563,257 in 1994[4] and $200,000 from the assets sale to Thomson.

Glazier used C3 to sell his intellectual product and powers, including the software that he had co-developed at Columbia and which Columbia licensed to C3. Through payments from C3 to Glazier, Inc., he received the vast majority of the resulting revenues.[5] Both Glazier, Inc. and C3 were located at Glazier's apartment, and Glazier was the sole signatory on C3's bank account. Glazier, Inc.'s consulting agreement with C3 expressly provided that it was terminable if Glazier himself was unable to perform or supervise the performance of Glazier, Inc.'s obligations to C3, which were described as "marketing [C3's] software products, developing new software products, enhancing [C3's] existing software products, and providing support services to [C3's] clients." These obligations essentially described C3's entire business.

Glazier himself gave Thomson a resumé stating that from 1992 to the present, Glazier was the principal, owner and manager of C3, and that Glazier, Inc. was the predecessor to C3. C3 paid over $8000 to the law firm that represented Glazier personally in his negotiations with Thomson. These negotiations resulted in Thomson employing Glazier and paying him a $450,000 signing bonus. C3 then paid Glazier, through Glazier, Inc., an additional $210,000 out of the proceeds of the assets and other funds that were in the C3 bank account following the assets purchase. After payment of taxes and other expenses, this left only $10,000 in C3's account. Freeman contends that this balance renders C3 unable to fulfill its alleged obligations to him.[6] Additionally, Glazier had an option to purchase all the shares of C3 from its sole shareholder for $2000. Thus, at his discre-

tion, he could have become the sole shareholder for a small payment.

The district court found that "[t]o regard [Glazier] as anything but the sole stockholder and controlling person of C3 would be to exalt form over substance." *Freeman*, , 931 F.Supp. at 1120. Under the unique facts of the instant case, viewed in their totality, we agree that it is appropriate to treat Glazier as an "equitable owner" for veil-piercing purposes. *See Lally*, 603 N.Y.S.2d at 621.

### B. Piercing the C3 Veil

■■ The presumption of corporate independence and limited shareholder liability serves to encourage business development. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir.1991). Nevertheless, that presumption will be set aside, and courts will pierce the corporate veil under certain limited circumstances. *See Thomson–CSF*, 64 F.3d at 777. Specifically, such "[l]iability . . . may be predicated either upon a showing of fraud or upon complete control by the dominating [entity] that leads to a wrong against third parties." *Wm. Passalacqua Builders*, 933 F.2d at 138. As we explained in *Wm. Passalacqua Builders*, to pierce the corporate veil under New York law, a plaintiff must prove that "(1) [the owner] ha[s] exercised such control that the [corporation] has become a mere instrumentality of the [owner], which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff." *Id.* (internal quotation omitted).

■ To the extent that we have restated this test in cases such as *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club International, Inc.*, 2 F.3d 24 (2d Cir.1993), in

---

4. From this revenue, C3 paid $66,541 in development costs, $18,332 in royalties, presumably to Columbia, $53,875 in sales commissions, $20,-323 in legal fees, and $397,900 to Glazier, Inc. in consulting fees.

5. The consulting agreement provided that C3 would not pay anyone compensation unless Glazier, Inc. had first received its share in full. The consulting agreement obligated C3 to pay Glazier, Inc. annual compensation of $150,000, with "cost-of-living" adjustments. In addition, it was

to pay Glazier, Inc. a bonus for each calendar year equal to 60% of the first $200,000 in revenues received by C3, 70% of the next $200,000, 80% of the third $200,000, and 85% of all revenues received thereafter.

6. Although Glazier contends that C3 maintains in excess of $100,000 pending the outcome of this litigation, these funds are in escrow to indemnify Thomson for its legal fees.

which we stated that veil-piercing will be allowed "in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary," *id.* at 26, the element of domination and control never was considered to be sufficient of itself to justify the piercing of a corporate veil. Unless the control is utilized to perpetrate a fraud or other wrong, limited liability will prevail. *See Wm. Passalacqua Builders,* 933 F.2d at 138. As we explained in *Electronic Switching Industries, Inc. v. Faradyne Electronics Corp.,* even if a plaintiff showed that the dominator of a corporation had complete control over the corporation so that the corporation "had no separate mind, will, or existence of its own," New York law will not allow the corporate veil to be pierced in the absence of a showing that this control "was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of." 833 F.2d 418, 424 (2d Cir.1987); *see Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 853 (2d Cir.1985).

In determining whether "complete control" exists, we have considered such factors as: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities. *See Wm. Passalacqua Builders,* 933 F.2d at 139. No one factor is decisive. *See Thomson–CSF,* 64 F.3d at 778. In this case, there is little question that Glazier exercised "complete control" over C3.

As discussed in the context of equitable ownership, the record is replete with examples of Glazier's control over C3. Therefore, the district court's finding of control was not erroneous. However, the district court erred

in the decision to pierce C3's corporate veil solely on the basis of a finding of domination and control. "While complete domination of the corporation is the key to piercing the corporate veil, ... such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required." *Morris v. New York State Dep't of Taxation & Fin.,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 811, 623 N.E.2d 1157, 1161 (1993) (citation omitted); *see Wm. Passalacqua Builders,* 933 F.2d at 138. Thus, while we accept the district court's factual finding that Glazier controlled C3, we remand to the district court the issue of whether Glazier used his control over C3 to commit a fraud or other wrong that resulted in unjust loss or injury to Freeman. Though there is substantial evidence of such wrongdoing, a finding on this issue must be made in the first instance by the district court before veil-piercing occurs. We therefore remand to the district court with instructions to determine whether Glazier used his control over C3 to commit a fraud or other wrong that resulted in an unjust loss or injury to Freeman.

### III. Freeman's Cross–Appeal

Freeman cross-appeals (1) the denial of his motion to compel arbitration of his claims against Thomson; (2) the stay of his claims against Thomson pending the final determination of the arbitration; and (3) the placement on the suspense docket of that which was not otherwise disposed of by the June 28, 1996, memorandum opinion. We affirm the order of the district court with respect to Thomson for the reasons stated by the district court.

We have considered the parties' remaining contentions and find them all to be without merit.

### CONCLUSION

For the foregoing reasons, we affirm the order of the district court with respect to Thomson. However, we reverse and remand to the district court those aspects of the order and the subsequent judgment compelling Glazier to arbitrate Freeman's claims against him for the district court to determine whether Glazier used his control over

C3 to commit a wrongful or unjust act toward Freeman in determining whether to pierce the corporate veil.

GODBOLD, Senior Circuit Judge, concurring in part, dissenting in part.

I concur in part and dissent in part.

I agree that we have jurisdiction over the appeal and the cross-appeal.

I concur in affirming the district court's holding that Glazier was in total control of C3. I see no need, however, to remand the case to the district court for it to determine whether "Glazier used his control over C3 to commit a fraud or other wrong that resulted in an unjust loss or injury to Freeman." The record before us discloses fraud or other wrong by Glazier, through C3, resulting in an unjust loss or injury to Freeman. Consequently C3's corporate veil is to be pierced, and, without more, arbitration should proceed against Glazier as well as C3.

In some "corporate veil" cases one must search the record for evidence shedding light on whether an individual's control of the corporation has been used to commit a fraud or wrong resulting in unjust loss or injury. Not in this case. Here it all hangs out.

C3 is Glazier's creature, subject to his "complete control" ("he [Glazier] was C3"). C3 agreed with Freeman for him to sell and license C3's software products for five years and to receive commissions for ten years on revenue received from Freeman's clients. Plus, if C3 merged or consolidated, Freeman was to receive an additional payment of 10% percent of the total consideration conveyed. The agreement contained a termination clause. C3 could terminate on sixty days notice, but Freeman was entitled to receive all compensation for services previously rendered as well as the commissions that accrued over a ten year period (presumably to include 10% percent of the consideration for a buy out or merger).

An arbitration clause was included: "Any controversy or claim arising out of or related to this Agreement or any breach thereof ... shall be settled by arbitration."

Approximately a year after the C3–Freeman agreement was made C3 entered into an agreement with Thomson Trading Services, Inc., an account developed by Freeman, to make Thomson its exclusive worldwide marketer. Thomson purchased C3's assets and C3 became essentially a shell. Thomson hired Glazier as vice president and director of research at a handsome salary and commissions and paid him a $450,000 "signing bonus" plus $210,000 for C3 assets. Thomson took over existing C3 agreements, but not C3's agreement with Freeman. That agreement remained C3's responsibility. But C3 has paid Freeman nothing.

It remained for C3 to get rid of Freeman. It did so by a purported termination of the C3–Freeman agreement. C3 recited that it was exercising its option to terminate as "an action to combat the overly generous termination clause we committed to, and to force a renegotiation of your sales contract." In short, Freeman was not to receive the benefits guaranteed him by the termination clause; the termination was to force him to give up the "overly generous" termination benefits he was entitled to receive. The asserted termination was not to implement the provision for termination but in derogation of it.

By this Tinker-to Evans-to Chance play:

— C3's business has gone to Thomson.

— Thomson has handsomely rewarded Glazier.

— Thomson, in acquiring C3, has not assumed responsibility for the Freeman agreement.

— Glazier is enjoying the generous fruits of the C3– Thomson deal while C3 has been reduced to a shell.

— Freeman has been stripped of his benefits, paid nothing, and hung out to dry, on the asserted ground that benefits (past and future) agreed to be paid to him by C3 were too generous.

This is fraud by Glazier—a fully revealed rip off. But if one shrinks from the word "fraud" it is at least a "wrongful injury." We

should not hesitate to say so at the appellate level, for the record is clear.