**MARS ELECTRONICS OF N.Y., INC., Plaintiff,**

v.

**U.S.A. DIRECT, INC. and Erik Put, Defendants.**

**No. Civ.A. 94–CV–4306 (DGT).**

United States District Court, E.D. New York.

Nov. 23, 1998.

Stahl & Zelmanovitz, New York City, for Plaintiff.

Erik Put, pro se.

---

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

This case has a long and drawn out history. Plaintiff Mars Electronics of N.Y., Inc. ("Mars") filed a Complaint in the Eastern District of New York on or about September 13, 1994, alleging claims of fraud, conversion and breach of contract, seeking $588,816.30 plus interest, costs and punitive damages, and contending that defendant Erik Put ("Put") was the alter ego of defendant U.S.A. Direct, Inc. ("USAD"). Shortly thereafter, Mars moved for an Order of Attachment against defendants' property. Judge Joanna Seybert granted an Order of Attachment against USAD, but finding the evidence that USAD was Put's alter ego inconclusive, Judge Seybert declined to grant the Order of Attachment against Put. *See* Mem. & Order, 94–CV–4306, dated 10/14/94. I entered partial summary judgment against USAD by Order dated July 16, 1996, and issued a default judgment against USAD on January 8, 1998. Mars now moves for summary judgment seeking to hold Put "personally liable for the judgment obtained by Mars against defendant [USAD]." Def. Not. of Mot. for Summary Judgment.

### Background

#### (1)

Mars is a distributor of electronic products. Defendant USAD was, at the time of the transactions in question, engaged in purchasing goods from wholesalers and exporting them to Europe. Defendant Put was, at all times, the sole shareholder, officer and director of USAD. Def. Aff. in Opp. to Mot. for Summary Judgment, p. 4.

An evidentiary hearing on Mars' Motion for Attachment was held before Judge Seybert on September 29 and October 5, 1994. At the evidentiary hearing, evidence was presented that USAD and MARS conducted business in two forms: (1) "plaintiff either sold electronics to USAD for resale to USAD's own customers, in which case payment would be owed by USAD to plaintiff regardless of payment by the customers," or (2) pursuant to an agreement negotiated between Mars and USAD, "plaintiff delivered electronics to USAD for sale to plaintiff's own customers, in which case payment would be owed by USAD to plaintiff upon payment by the customers [to USAD]." Mem. & Order, 94–CV–4306, dated 10/14/94. The dis-

pute in this case is over business conducted in the second manner.

At the hearing, Mars contended that it sold specific goods valued at nearly $600,000 to USAD for shipment to Mars' customers in Europe; that USAD shipped those goods to Mars customers; that Mars' customers paid USAD for the goods, thus, triggering USAD's payment obligation to Mars; and that USAD failed to pay Mars, and instead, kept the money which Put then secreted. *See id.* Following the evidentiary hearing, Judge Seybert issued a Memorandum and Order awarding Mars an Order of Attachment against USAD in the amount of $293,-090. *See* Mem. & Order, 94–CV–4306, dated 10/14/94. Judge Seybert found that "[t]he evidence before the Court" at that time did not "demonstrate that plaintiff [would] probably succeed in proving all of the amounts [claimed to be] owed by USAD." *Id.* at 7. Judge Seybert based her finding on the fact that Mars did not proffer "specific proof" that any Mars customer had actually paid USAD funds due to Mars with the exception of evidence relating to payment from two companies, AM Trade Corporation ("AM Trade") and Impotex. *Id.* at 8. As to $180,-041 claimed to be owing from USAD's shipment on Mars' behalf of goods to Impotex, Judge Seybert found that the record before the court "fail[ed] to show what the relationship between the parties was regarding this transaction and therefore fail[ed] to establish probable success on the merits." *Id.* at 9. No additional evidence was submitted by Mars to either Judge Seybert or myself concerning the Impotex transaction.

As to USAD's $245,090 transaction with AM Trade, Judge Seybert found that Mars had established probability of success on the merits based upon: (i) testimony offered by plaintiff that it had negotiated a $245,090 sale of electronics to AM Trade, to be shipped by USAD; (ii) evidence that Mars invoiced USAD for the goods on August 4, 1994, and that USAD then invoiced AM Trade the following day; (iii) matching invoices from Mars to USAD and from USAD to AM Trade listing the same (Panasonic) goods and the same quantity, with the total amount being $245,090;[1] (iv) a written notation by the Vice President of AM Trade on the invoice from USAD, stating that the payment sent to USAD was "for Mars Electronics;" and (v) documentation of a wire transfer in the amount of $245,090 from AM Trade to USAD's account at the First National Bank in Hope, New Jersey on August 15, 1994.[2] *See id.* at 10–12; Tr. dated 10/5/94, pp. 201–12.

At the hearing, Put testified that he could not recall whether the goods purchased by AM Trade were sold on Mars' behalf and claimed that all money in his "direct possession," including any money received from AM Trade, had been forwarded to Mars. *Id.* at 12. Put's attempts to refute plaintiff's evidence were characterized as "meager" and "not sufficiently credible" by Judge Seybert who found it "disconcerting" that Put, as "USAD's principal shareholder, president and chief operating officer," was often "evasive" when questioned.[3] *Id.* at 12–13.

---

1. The total amount shown on the USAD invoice was higher—$271,876. This discrepancy is explained by testimony from both plaintiffs and defendants that Mars billed USAD a higher amount than it charged its customers for goods that USAD shipped for Mars. USAD made its money from the benefits it received from its tax status in Europe (the destination of the goods) and from subsidies it received under European Community regulations. *Id.* at 11; Tr. dated 10/5/94, pp. 201–212.

2. USAD used only one bank account in 1994—an account at the First National Bank of Hope, New Jersey, account no. 537632. Tr. dated 9/29/94, pp. 67–69.

3. Put, in his affidavit in opposition to this motion, contradicts his hearing testimony, now free-

ly admitting that he took the AM Trade money, but claiming that it was owed to him. *See* Def. Aff. in Opp. To Pl. Mot. For Summary Judgment. Put cannot create a genuine issue of material fact by contradicting his own prior sworn testimony. *See United Nat'l Ins. Co. v. Tunnel, Inc.,* 988 F.2d 351, 354 (2d Cir.1993), *citing Trans–Orient Marine Corp. v. Star Trading & Marine Inc.,* 925 F.2d 566, 572 (2d Cir.1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); *Klein v. Nat'l Life of Vermont,* 7 F.Supp.2d 223, 233 (E.D.N.Y.1998) (non-movant "can raise no genuine issue of material fact by contradicting without explanation his prior sworn testimony").

Judge Seybert also granted Mars an Order of Attachment in the amount of $48,888.60, the face value of a dishonored check given by USAD to Mars, which Put acknowledged that USAD had an obligation to pay. *See id.* at 13. However, Judge Seybert specifically declined to grant an order of attachment against Put, finding that "the evidence before the Court at this time as to whether USAD acted as Put's alter ego simply does not justify" such a result. *Id.* at 17. At the time that the decision not to pierce USAD's corporate veil was made, the evidence was that (i) Put took funds totaling $272,000 from USAD's bank account to pay personal expenses at the time it owed monies to Mars,[4] but (ii) Put used most of the withdrawn funds to purchase jeans for export in the ordinary course of business. *Id.* Importantly, there was no evidence that (i) the funds removed by Put were improperly authorized dividends or salary payments, or that the practice of paying for Put's personal expenses out of USAD funds commonly occurred, or that (ii) Put failed to deal at arm's length with his entities, or that his entities failed to deal at arm's length with each other. *Id.*

### (2)

Mars subsequently moved for partial summary judgment against USAD regarding the dishonored check ($48,888.60) and the AM Trade claim ($245,090). By my Order, dated July 16, 1996, Mars' motion for partial summary judgment was granted against USAD in the amount of $268,248.81 ($293,978.60 less a $64,852.99 setoff for a USAD counterclaim, plus prejudgment interest at a rate of 9% per annum from August 17, 1994, totaling $39,123.20). *See* Order, 94–CV–4306, dated 7/16/96. Mars' attempts to enforce this judgment against USAD have been futile.

By order dated August 20, 1997, I granted defendants' attorney's motion to withdraw from the case, and ordered defendants to retain a successor attorney within 30 days. Order, 94–CV–4306, dated 8/20/97. Defendants neglected, or were unable, to retain successor counsel despite the grant of several extensions of time to do so by Magistrate Judge Gold. Order, 94–CV–4306, dated 1/8/98. By Order dated January 8, 1998, I adopted Magistrate Judge Gold's recommendation for the issuance of a default judgment against USAD and granted Mars judgment against USAD in the sum of $768,703.68. *Id.* The Clerk of the Court entered judgment against USAD in that amount by Judgment dated January 21, 1998 and filed January 22, 1998. Judgment, 94–CV–4306, dated 1/21/98. Again, Mars has been unable to collect on this judgment because USAD currently has no assets.

### (3)

Plaintiff now offers new evidence in support of its motion for summary judgment against Put, seeking to prove that USAD was merely Put's alter ego, and that therefore, Put should not be allowed to rely on USAD's corporate status to limit his liability. Michael Kaplan, CPA, was identified through defendant's response to plaintiff's interrogatories as one of the persons "who maintained the books and records of [USAD] or recorded financial information in the corporation's books and records." Resp. to Pl. Int., dated 1/16/98. Kaplan prepared a bank reconciliation statement for USAD's account at the First National Bank of Hope as of August 31, 1994. Bank Reconciliation Register. The register evidences the following transactions: (i) on August 16, 1994, $245,090 was received by USAD from AM Trade; (ii) on August 17, 1994, $267,000 was withdrawn from USAD's

---

4. Evidence presented at the attachment hearing was that Put drew the following checks on August 17, 1994 on USAD's bank account: (i) a certified check in the amount of $20,000 made payable to Erik Put (Put testified that the purpose for this check was to invest in a new company that he was forming; that he did not use the check; and that he converted it into a cashier's check, and was "holding" on to it at the time of the hearing; Tr. dated 9/29/94, pp. 78–79); (ii) two certified checks, one for $20,000 and one for $7,000 (these funds were paid to builders working on Put's home; Tr. dated 9/29/94, p. 82; Tr. dated 10/5/94, pp. 217–18); (iii) two certified checks in the amounts of $20,000 and $35,000 made payable to Put's wife, Laurie A. Tinfow (Tinfow was not involved in the USAD business; Tr. dated 9/29/94, pp. 46, 82); (iv) five certified checks made payable to Erik Put totaling $150,000, issued for "business purposes," (Put testified that he converted these into cashiers checks; Tr. dated 9/29/94, pp. 80–82; Tr. dated 10/5/94, pp. 151–52). As of August 16, 1994, prior to the issuance of the above certified checks, there was $273,392.25 in USAD's bank account. Tr. dated 9/29/94, p. 76.

bank account under the heading "Miscellaneous Debit;" (iii) of the $267,000, $7,000 was listed as a payment for office repair; (iv) another $35,000 was paid for the building of a stable;[5] (v) $205,000 was converted into cashier's checks and placed into a safe deposit box;[6] and (vi) $20,000 remains unaccounted for.

Put made all of the material decisions regarding USAD's operations and affairs. Def. Aff. in Opp. to Mot. for Summary Judgment, p. 4. USAD issued no dividends, but Put received a salary which he could raise at will. *Id.*; Kaplan Dep., pp. 27, 29–30. With respect to minutes of USAD shareholder or directors' meetings, Put testified that he simply wrote down his "general goals and general objectives and so on," but produced no such notes. Put Dep., pp. 32–33. Put "pretty much" left the original corporate kit for USAD the way it was. Put Dep., pp. 51–52. There were no corporate authorizations or resolutions of any kind. *Id.* No record evidencing that any corporate formalities were observed was ever produced in response to plaintiff's requests. Pl. Req. for Prod. Of Docs.; Resp. to Pl. Request for Docs.

Put maintains that "every quarter there were Board of Director(s) meetings," and that "shareholders had 4 meetings all together in the period between March 1994 and August 1994," but produces no evidence that any of these actually took place. Resp. to Pl. Ints., ¶ 7. Put's excuse is that the requested papers were seized by the Dutch Government in August 1994 as part of an investigation into Put's European business practices. *See* Resp. to Pl. Req. for Docs.[7]

Put borrowed money from USAD without documentation. Kaplan Dep., pp. 38–39. In 1994, loans that Put had taken from USAD in the amount of $95,000 were eliminated by reclassifying the loans as a reduction in Put's capital stock. Kaplan Dep., pp. 62–64; USAD General Journal. Put contends that these loan transactions were "advance payment," of "bonuses and or salary," and that they were accounted for "meticulously." Def. Aff. in Opp. to Pl. Mot. for Summary Judgment, p. 4. Put, however, has not produced any documentation evidencing these purported loan transactions. Kaplan Dep., pp. 80–81. USAD also made payments to Put's spouse, purportedly in repayment of a loan or loans she made to USAD. Put maintains that payments to his wife were "reimbursements" of corporate expenses made on her personal credit cards. *Id.* Once again, however, Put offers no evidence of this claim—no loan agreements, no notes evidencing payment obligations, and no credit card bills.

Put also commingled USAD funds with Put's personal funds. Put received deposits from USAD customers directly into his personal checking account. Kaplan Dep. at 69–70. Put also paid USAD expenses out of his personal checking account. Analysis of Personal Checking Account of Erik Put, 1994. Put conducted USAD's business out of Put's and his wife's home as part of an "informal"

---

5. The first two withdrawals noted in the register correspond in amount to the certified checks Put testified were used to pay Put's wife and builders on Put's home. *See* Kaplan Dep., pp. 48–50.

6. Put represented to his accountant that the $205,000 was in a safe deposit box. Kaplan Dep., pp. 42–47. At Kaplan's request, Put confirmed in writing that $205,000 had been placed in a safe deposit box. *Id.* at 52. In accordance with Put's direct instructions, Kaplan recorded the money taken out by Put and placed into a safe deposit box as "cash on hand" readily available to the corporation. *Id.* at 44–52. Kaplan does not know the location of the alleged safe box. *Id.*

7. It is curious, however, that all of the records of shareholder and director meetings, as well as corporate ledger books, financial statements, tax returns and corporate records, were maintained in the Netherlands given that USAD was incorporated in Delaware and conducted business in New Jersey. Equally curious is the lack of any offer of proof of a (four years long) Dutch government investigation into USAD's business affairs and corresponding seizure of USAD's documents. Put also maintains that records of deposits and withdrawals, wire transfers, canceled checks, account statements and correspondence were kept by his wife (who was not involved in the USAD business) during their divorce and never returned. Seemingly, the Dutch government and Put's ex-wife have more information about USAD than its sole shareholder, officer and director.

arrangement.[8] While Put claims that an annual rent of about $2,000 was paid by USAD, Put Dep., pp. 63–66, Put did not claim any rent as personal income on his 1994 tax returns. Kaplan Dep., pp. 93–95.

At the end of 1994 there was no money remaining in USAD's bank account at the First National Bank of Hope. Bank Reconciliation Register, dated 12/31/94. According to USAD's Income Statement for the year ended December 31, 1994, USAD incurred a net loss for 1994 of $32,594.56. USAD Income Statement, 1994. USAD's Balance Sheet as of December 31, 1994 included under "assets" the $205,000 that Put placed in a safe deposit box. *Id.* When the $205,000 is considered as an asset, USAD's December 1994 balance sheet shows $2,645 in assets above liabilities. When the $205,000 is not considered, USAD's liabilities exceed its assets by over $200,000. *Id.*

Finally, USAD issued a check to Mars in the amount of $48,888, dated August 18, 1994, which was not honored by USAD's bank. Tr. dated 9/29/94, p. 61. On September 9, 1994, Put faxed a letter to Mars advising Mars that USAD's bank account had been frozen. Tr. dated 9/29/94, p. 92. Put testified at the attachment hearing that this "was a lie." Tr. dated 9/29/94, p. 113.

**8.** There was no lease between USAD and Put and his wife. Put acknowledged that "[i]t's kind of tough to draft a lease with yourself." Tr. dated 9/29/94, p. 66.

**9.** Though both parties have treated this case as one controlled by New York law, because many of the critical events took place in New Jersey (defendant ran his business out of and maintained an office in New Jersey; USAD's sole bank account was located in New Jersey; Put withdrew USAD funds from New Jersey bank account; Put faxed false letter regarding the $48,888.60 check from his New Jersey office), there is a question whether New York or New Jersey law would apply to the dispute here. Supplemental letter briefs on the issue were requested, and after reviewing the briefs and applicable law, it is clear that the case presents a false conflict.

New Jersey law is similar to New York law and would only hold the defendant liable for the amount of the fraud and not for the entire amount of the debt. *See AYR Composition, Inc. v. Rosenberg*, 261 N.J.Super. 495, 619 A.2d 592 (App.Div.1993) (principals not liable for all of corporation's debts, but only those debts as to which principals committed fraud). In *AYR Composition*, the New Jersey Superior Court, interpreting the leading New Jersey case on piercing the corporate veil, stated that

> if a corporation has $500,000 in debts and the corporate principals improperly transfer a few thousand dollars worth of corporate property, representing the final assets of the corporation, it would be highly unfair to charge the principals with the total corporate indebtedness which may have arisen over many years of corporate existence when the corporate form was scrupulously followed. The principals should be responsible only for the effects of their [wrongful] actions.

*Id.* at 506, 619 A.2d 592, *citing State Dep't of Envtl. Protect. v. Ventron Corp.*, 94 N.J. 473, 500, 468 A.2d 150 (1983). Thus, as there does not appear to be any meaningful difference between New York and New Jersey law as applied to the facts of this case, and as no party has requested that New Jersey law should be employed, only New York law will be discussed.

### Discussion

#### (1)

■ Plaintiff moves for summary judgment on the first, second and fifth claims of plaintiff's Complaint. Those claims sound in fraudulent conspiracy, conversion and fraud. Plaintiff also seeks to hold defendant Put liable for the default judgment against USAD, in the amount of $768,703.68 plus the statutory rate of interest of 9% from January 22, 1998. To prevail on its motion for summary judgment, plaintiff must prove, as a matter of law, that USAD's corporate veil should be pierced. *See* Fed.R.Civ.P. 56(c). As this case arises under federal diversity jurisdiction, New York conflict of laws applies. *See Stuart v. American Cyanamid Co.*, No. 97–9548, 158 F.3d 622, 1998 WL 687417 at *3 (2d Cir. Sept.21, 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules.") (citations omitted).[9]

In *Morris v. New York State Dep't of Taxation and Finance*, 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 810, 623 N.E.2d 1157 (1993), the leading New York case on piercing the corporate veil, the New York Court of Appeals stated that

> [t]he concept of piercing the corporate veil is a limitation on the accepted principles

that a corporation exists independent of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners.

See *Morris*, 82 N.Y.2d at 140, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (citations omitted). The doctrine of piercing the corporate veil is typically employed by a party seeking to "circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation." *Id.* at 140–41, 603 N.Y.S.2d 807, 623 N.E.2d 1157. As the Court of Appeals stated in *Morris*,

> [t]he concept is equitable in nature and assumes that the corporation itself is liable for the obligation sought to be imposed.... Thus, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners.

See *id.* at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157. The decision to pierce or not to pierce the corporate veil necessarily turns upon the facts and equities of a given situation. *See id.* While there are no "definitive rules" governing when a court may exercise the power to pierce, the *Morris* court found that piercing the corporate veil requires a showing that: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *See id.*; *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997) (citing *Morris* for applicable New York law on piercing the corporate veil); *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (same).

Prior to *Morris*, the Court of Appeals for the Second Circuit had interpreted New York law as permitting a plaintiff to pierce the corporate veil in either of two situations: " 'to prevent fraud or other wrong,' or in the case of complete domination and control, as 'where a parent dominates and controls a subsidiary.' " *Thrift Drug*, 131 F.3d at 97 (quoting *Carte Blanche (Singapore) Pte, Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir.1993)). *Morris* rejected this either/or dichotomy and it is now clear that under New York law a plaintiff seeking to pierce the corporate veil must prove both complete domination and that the domination was used to commit a fraud with respect to the transaction at issue. *See American Fuel Corp.*, 122 F.3d at 134 (quoting *Morris*, 82 N.Y.2d at 141–42, 603 N.Y.S.2d 807, 623 N.E.2d 1157) ("While complete domination of the corporation is the key to piercing the corporate veil ... such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required...."); *Thrift Drug*, 131 F.3d at 97 (quoting *Morris*, 82 N.Y.2d at 141–42, 603 N.Y.S.2d 807, 623 N.E.2d 1157) ("The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene."); *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1052–53 (2d Cir.1997) (New York law will not allow corporate veil to be pierced in absence of showing that domination was used to commit fraud or other wrong).

In *Passalacqua Builders v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir.1991), the Second Circuit enumerated a list of factors to aid in determining whether the facts and circumstances of a given situation identify a corporation that has been dominated as to a given transaction for purposes of piercing the corporate veil. *See Passalacqua*, 933 F.2d at 139. Those factors are:

(1) whether corporate formalities are observed, (2) whether the capitalization is adequate, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) whether there is overlap in ownership, officers, directors, and personnel, (5) whether the corporate entities share common office space, address and telephone numbers, (6) the amount of business discretion displayed by the allegedly dominated corpora-

tion, (7) whether the alleged dominator deals with the dominated corporation at arms length, (8) whether the corporation is treated as an independent profit center, (9) whether others pay or guarantee debts of the dominated corporation, and (10) whether the corporation in question had property that was used by the alleged dominator as if it were the dominator's own.

*American Fuel Corp.*, 122 F.3d at 134 (citing *Passalacqua*, 933 F.2d at 139).

### (2)

■ Mars first sought to have USAD's corporate status pierced at the attachment hearing in October and November 1994. At that time, courts interpreting New York law in the Second Circuit pierced the corporate veil upon a showing that a corporation acted as a principal's alter ego, even absent any showing of fraud. *See Carte Blanche*, 2 F.3d 24 (2d Cir.1993). Under this less demanding standard, Judge Seybert found that there was insufficient evidence to justify entering an order of attachment directly against Put. *See* Mem. & Order, 94–CV–4306, dated 10/14/94. The new evidence that Mars has proffered thoroughly establishes that Put dominated and controlled every aspect of USAD's business affairs such as to render USAD Put's alter ego during the entire period in question. Put was the sole shareholder, officer and director of USAD, and made all material decisions concerning the operation of the business. Put commingled business and personal funds in his personal checking account. USAD never issued a single dividend, and Put took money out of USAD at will, reclassifying the "loans" he took from USAD as a $95,000 stock repurchase. USAD, while paying its bills at first, was dangerously undercapitalized by late 1994, and eventually ran out of money by the end of the year. Put offers no evidence that USAD made any serious attempts at maintaining corporate formalities, notwithstanding Put's conclusory assertions to the contrary. Put ran USAD out of his home and there is no evidence that USAD ever paid rent. Significantly, Put withdrew $267,000 from USAD's bank account on August 17, 1994 (the day after AM Trade wired a $245,-090 payment into that account). From all

these facts, one must conclude that Put dominated USAD such that USAD was Put's alter ego.

### (3)

■ Having without question established domination, plaintiff must also show that the domination was used to commit a fraud. The showing of fraud that must be made is a showing that defendant's domination, with respect to the specific transaction at issue, was used to perpetrate a fraud against the plaintiff. *See American Fuel Corp.*, 122 F.3d at 134 (plaintiff must show "(i) that the owner exercised complete domination over the corporation *with respect to the transaction at issue;* and (ii) that *such domination* was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil") (emphasis added); *Thrift Drug, Inc.*, 131 F.3d at 97 (same). Here, plaintiffs complain not of a single fraudulent transaction, but rather ten distinct transactions taking place over a seven week period from June 14 to August 8, 1994, each of which plaintiff seeks to hold defendant Put personally liable for. To do so, plaintiff must establish that Put committed separate fraudulent or wrongful acts that would justify piercing the corporate veil as to each of these transactions.

However, plaintiff's briefs and affidavits offer evidence of fraud or other wrong as to only two of the transactions at issue—the AM Trade transaction and the dishonored check. *See* Pl.Mem. in Sup. of Mot. for Summary Judgment, pp. 21–23. As to these two transactions, plaintiff has sufficiently established the fraud or wrong required to pierce USAD's corporate veil and hold Put personally liable.

The evidence shows that in a letter dated August 15, 1994, Put complained to Moishe Schwimmer, President of Mars, that Put had "lost money on the [shipping] deals," and that Put believed that he "may have been financing [Mars'] profits." Letter from Put to Schwimmer dated 8/15/94. On the following day, AM Trade wired $245,090 into USAD's bank account pursuant to one of those "deals." *Id.* On August 17, 1994, Put withdrew approximately $267,000 from

USAD's bank account in the form of a series of certified checks. Put made these checks payable to the builders on his home, his wife, and to himself personally in the amount of $205,000. At the attachment hearing, Put testified that the checks he made payable to himself were drawn for "business purposes," including for the purpose of buying jeans for export. During discovery, however, plaintiff learned from Put's accountant that Put did not use the money to buy jeans or to further USAD's business interests. The evidence is now clear that Put removed the funds not to buy jeans as he testified at the attachment hearing, but for personal reasons and reasons unknown perhaps to any person but Put. Put claimed to have placed $205,000 of USAD money in a safe deposit box, but that money is unaccounted for and the location of the box unknown, and while Put also claimed to have converted the $205,000 into cashiers checks, he has never produced evidence that the checks ever existed. Put's testimony is consistent, however, with his use of USAD funds to renovate his home and to build a stable for his wife.

Moreover, Put's taking of the AM Trade money would appear to constitute a conversion of those funds and a fraudulent conveyance under New York law. Section 274 of New York's Debtor and Creditor Law provides:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

N.Y. Debt & Cred. Law § 274 (McKinney 1990).[10] Thus, it is apparent that Put has committed a fraud (or wrong) against his creditors as well as this court.

The evidence also shows that Put used his domination of USAD to commit fraud concerning the dishonored check in the amount of $48,888 that Put issued on behalf of USAD to Mars on August 18, 1994. Put stated, in a typewritten letter faxed to Mars on September 9, 1994, that the check had been dishonored because USAD's bank account had been frozen. Tr. dated 9/29/94, p. 92. In fact, the bank account had not been frozen, but Put had, in his own words, "lied" about the bank account being frozen in order to "get that guy [Schwimmer] off my back." *Id.* Apparently, when the check had not cleared, Schwimmer had called Put to voice his concern. After a number of such phone calls, Put became "fed up" with Schwimmer and concocted the story about USAD's bank account being frozen. *Id.* Considering that USAD's bank account contained over $58,000 on September 9, 1994, the very day on which Put lied about USAD's account being frozen, it is fair to conclude that Put defrauded his creditors. Clearly, Put's lie prejudiced Mars from taking steps to protect its interests. Accordingly, Put is found to be personally liable on the default judgment against USAD with respect to the AM Trade transaction and the dishonored check.

As to the other transactions at issue, plaintiff has not offered evidence of fraud or wrongful conduct. Absent such evidence, there is an insufficient basis under New York law upon which to pierce USAD's corporate veil as to these remaining transactions. Indeed, despite the two proven instances of direct fraudulent conduct engaged in by Put, it would be inequitable to hold Put personally liable for the full amount of the default judgment against USAD on a motion for summary judgment absent conclusive evidence that Put used his domination of USAD to commit fraud with respect to each and every transaction at issue.

While Put treated the corporation as his personal business vehicle, he was entitled to receive a salary and reimbursements for expenses, for example, and, therefore, not every withdrawal was fraudulent or wrongful. Moreover, other than by AM Trade, there is no showing that monies were paid by Mars' customers to USAD at the time of the eight remaining transactions at issue, much less that amounts corresponding to the amounts owing on these transactions were paid to

---

10. It should be noted that Mars did not plead a substantive claim for fraudulent conveyance.

USAD. Nor has plaintiff offered any evidence so far that Put immediately withdrew such funds for personal use rather than remit them to plaintiff as he was obligated to do. Accordingly, plaintiff is entitled to summary judgment, but only with respect to (i) $245,090, the amount of money wrongfully withdrawn by Put from USAD's bank account immediately following the deposit of funds by AM Trade plus prejudgment interest, and (ii) $48,888.60, the amount of the dishonored check, plus prejudgment interest at a rate of 9% per annum from August 17, 1994.

Plaintiff also moves for summary judgment on the first (fraudulent conspiracy), second (conversion), and fifth (fraud) claims of the Complaint. As discussed above, plaintiff has established that Put personally engaged in at least two frauds. Plaintiff has not, however, offered any additional evidence in support of its fraudulent conspiracy, conversion or fraud claims, or any evidence that Put converted USAD funds other than the $245,090. As to those two frauds, it is unnecessary to address whether the first, second and fifth claims of the Complaint constitute independent bases of liability because defendant Put has already been found liable upon the default judgment to the extent of those frauds. In other words, plaintiff may recover only once for the same wrong. As to the remaining eight transactions, for the same reasons that plaintiff is unable to pierce the corporate veil, summary judgment on plaintiff's alternate theories must be denied.

### (4)

▋ Put's counterclaim for freight forwarding charges ($64,852.99) belongs not to Put but to USAD. By failing to raise the counterclaim on behalf of USAD through counsel, as Put was instructed that he must do on many occasions by Magistrate Judge Gold, USAD lost the ability to do so following the entry of default judgment. Put may not now assert USAD's counterclaim as his own.[11]

Put also states that Mars perpetrated a fraud on the Court at the attachment hearing. Def.Aff. in Opp. to Pl.Mot. For Summary Judgment. Put bases his claim on the facts that (i) on the invoices annexed to plaintiff's complaint, the letter "A" is attached as a suffix to the invoice numbers, and (ii) USAD is designated as both the party to be shipped from and shipped to on the invoices. Tr. dated 9/29/94, p. 48. Put contends that this was done intentionally by Mars in order to make it seem like USAD was both the party being billed for goods and the party to whom the goods were being shipped, i.e., the party primarily liable for payment for the goods to Mars.

This matter was first raised by Put's counsel at the attachment hearing in September 1994. Tr. dated 9/29/94. At that time, Judge Seybert rejected Put's assertions of fraud, and declined to attribute any significance to the variation in the invoices which appeared to have been altered as a result of a computer error. *Id.* While it is not clear what relief Put seeks as to his claim of alleged fraud and perjury, no relief can be granted where, as here, Put fails to offer any credible material evidence of fraud.

### Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is granted in part and denied in part. Summary judgment is granted dismissing defendant Put's counterclaims. Pursuant to Rule 54(b), the Clerk of the Court is directed to enter judgment in favor of plaintiff as follows: (i) $245,090.00, and (ii) $48,888.60, plus prejudgment interest at a rate of 9% per annum from August 17, 1994 on both sums. The case is referred to Magistrate Judge Gold for discovery on plaintiff's remaining claims.

SO ORDERED.

---

11. Put's assertion of the counterclaim at this point underscores the unity of interest of USAD and Put in Put's mind. While the claim belongs to USAD, Put sees the counterclaim as belonging to himself.